[No. A099199. First Dist., Div. Three. May 28, 2004.]

ADAM PEART, a Minor, etc., et al., Plaintiffs and Appellants, v.
PAUL E. FERRO, et al., Defendants and Respondents.

---

**COUNSEL**

Walkup, Melodia, Kelly & Echeverria, Paul V. Melodia; Salter Law Firm, T. W. Salter; and B. E. Bergesen III for Plaintiffs and Appellants.

Anderlini, Finkelstein & Emerick; Anderlini, Finkelstein, Emerick & Smoot and Merrill G. Emerick for Defendants and Respondents.

---

**OPINION**

**McGUINESS, P. J.**—This case raises the questions whether the recreational use of a Sea-Doo personal watercraft constitutes a sport for purposes of the doctrine of primary assumption of risk, as set out by our Supreme Court in

*Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*) and its progeny, or whether instead the Legislature has preempted the scope of that doctrine as it would otherwise be applied to the use of the sorts of personal watercraft of which the Sea-Doo is an example.

Tracy Peart and minor Adam Peart (Peart), by and through his mother and guardian ad litem Tracy Peart, appeal from a final judgment entered against them and in favor of respondents Paul E. Ferro (Ferro), Julie Ferro, the Ferro Family Trust and minor Jason C. (Jason), through his guardian ad litem Kathryn Magruder, upon the grant of respondents' motion for summary judgment. Appellants contend that: (1) the doctrine of primary assumption of risk is inapplicable to the water sport activity at issue in this case; (2) respondents failed to carry their burden of establishing that, due to the nature of the activity and the parties' relationship to it, they owed no duty of care to appellants; and (3) state and federal statutes governing the operation of personal watercraft—specifically, Harbors and Navigation Code sections 655, subdivision (a), 655.7, and 658.5[1]—are inconsistent with and supersede the common law doctrine of assumption of risk as applied to the activities at issue in this case. Appellants' contentions are at odds with the record and case authority to the contrary. We conclude that the recreational use of the Sea-Doo is a sport activity to which the primary assumption of risk doctrine is applicable, irrespective of the statutes cited by appellants. We therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The accident at issue in this case involved the use of two Sea-Doo personal watercraft. A Sea-Doo is similar to a jet ski in its operation, differing only in that it is equipped with a seat similar to that of a motorcycle upon which the operator generally sits rather than stands. Respondent Ferro owned a model XP Sea-Doo; his mother, respondent Julie Ferro, owned a model GTI Sea-Doo. The model XP was a two-person vehicle, had approximately 110 horsepower, and could go 60 to 65 miles per hour. The model GTI was larger, could seat three people, and had a smaller engine with 90 horsepower that could go 50 to 55 miles per hour. The Ferros kept the two Sea-Doos at their vacation residence at Clear Lake in Lake County. Ferro himself had "[q]uite frequently" instructed guests in how to operate the Sea-Doos.

---

[1] Unless otherwise indicated, all further statutory references are to the Harbors and Navigation Code.

On July 10, 2000, appellant Peart and his cousin, respondent Jason, were visiting at Ferro's Clear Lake residence. At the time, Peart and Jason were 16 and 13 years old, respectively. Peart told Ferro that although he had never operated a sit-down Sea-Doo before, he had previously used stand-up jet skis by himself, and therefore had experience with that kind of personal watercraft. Jason told Ferro he had ridden on a sit-down Sea-Doo before, and had taken a boating class through the Boy or Cub Scouts. Ferro did not ask Jason if he had ever operated a Sea-Doo by himself.

Peart and Jason wanted to ride the Sea-Doos. When Jason asked his mother if he could, she told him to ask Ferro. According to Jason, Ferro said: "They are not toys; they are for just to have fun on, not to fool around on." He agreed that the two boys could ride, and explained to them how to operate the Sea-Doos. Among other things, Ferro told Peart to wear the key on a bracelet, how to use the key to start the Sea-Doo, and how to make turns. He also told Peart and Jason always to wear safety jackets. Aside from telling the boys about the five-miles-per-hour zone extending approximately 100 feet from the dock to the buoys, Ferro did not discuss the speed at which they should travel on the lake, the route to follow, or how long to stay out.

Ferro knew that an individual had to be at least 16 years of age in order legally to operate a Sea-Doo alone, and minors 12 years and older were only permitted to operate a Sea-Doo when accompanied by an adult. Consequently, he allowed Peart to operate one of the two Sea-Doos. However, when Jason went to the dock as though to drive the other one, Ferro said "[o]h, sorry, you can't drive alone," and volunteered to accompany him. Ferro, Peart and Jason were all wearing life vests.

At approximately 3:00 p.m., Peart departed from the dock on one of the Sea-Doos. Ferro observed that Peart was going under five miles per hour up until he reached the buoys. Within a minute, Ferro and Jason left the dock on the other Sea-Doo, with Jason driving and Ferro behind him as passenger. At first, Jason followed the same direction that Peart had taken. Once they passed the limits of the five-miles-per-hour zone, Jason accelerated to approximately 35 miles per hour.

For a while, Peart drove his Sea-Doo around the lake, accelerating and making turns. Respondents Jason and Ferro simply maintained a straight course without turning. After a while, Peart began to cut back and forth across the wake of the Sea-Doo driven by Jason and Ferro, coming less than 100 feet behind them. Feeling that Peart was "cutting it a little close," Ferro tried to signal to Peart to "push off a little further" from them. Peart maneuvered his Sea-Doo about 200 feet away and alongside Ferro and Jason. Then, as Jason and Ferro maintained a speed of approximately 30 miles per

hour, Peart accelerated to approximately 45 to 50 miles per hour and pulled directly in front of them, again about 200 feet away. Ferro saw Peart start to make a complete turn, first moving to the right and then veering sharply to the left and directly across their path. Peart "sort of disappeared behind [a] wall of water" caused by the 180-degree turn. When Peart reappeared almost immediately thereafter, he was directly in front of them and only 75 feet away. Ferro told Jason to "[t]urn." Less than two seconds later, the Sea-Doo they were riding collided with Peart's Sea-Doo.

In deposition testimony, Peart said he had decided to make a U-turn and go back to the dock. As he slowed down and started to make his turn, the Sea-Doo he was operating stalled or "shut off." Peart tried unsuccessfully to restart the engine. The next thing he knew, he was waking up in the hospital.

When the police came to investigate the accident, Ferro told them that just before the accident, he had grabbed the handlebars of the Sea-Doo and tried to help Jason turn it to avoid colliding with Peart. In deposition, Ferro acknowledged that "the truth was that I didn't do that and probably couldn't have done it." Ferro testified that he made this false statement because he was trying to be protective of Jason, who was very distraught at the time and blaming himself for the accident.

On March 14, 2001, appellants filed their complaint against respondents Ferro, Julie Ferro, the Ferro Family Trust, and "DOES 1 through 20," alleging that Peart had been seriously and permanently injured, and had incurred substantial and ongoing costs and expenses for medical care and treatment, "[a]s a direct and legal result of the carelessness and negligence" of respondents "and each of them." The complaint did not cite any provision of the Harbors and Navigation Code, made no reference to any statutory duty, and did not allege any cause of action based thereon. Neither did the complaint make any reference to or allegation of recklessness or intentionality on the part of any of the respondents.[2]

---

[2] In pertinent part, the key allegations of appellants' complaint are as follows: "4. At all times herein mentioned, [respondents] Julie Ferro and the Ferro Family Trust were the owners of a certain 1997 Bombardier brand PWC [personal watercraft] bearing California registration number CF8975PD and [respondent] Paul Ferro was operating and supervising the operation of said PWC with the permission and consent of said [respondents].

"5. At all times herein mentioned, [respondent] Paul Ferro was the owner of a certain Bombardier brand PWC bearing California license CF8963PD, and [appellant] Adam Peart was operating said PWC with the permission and consent of [Ferro].

"6. On or about July 10, 2000, at or about 3:00 p.m. at Clear Lake in the County of Lake County, State of California, [respondents], and each of them, were negligent in and about their ownership, entrustment, operation, supervision, maintenance and control of the said 1997 Bombardier PWC bearing California license CF8975PD so .as to directly and proximately cause it to strike and collide with the Bombardier PWC which [appellant] Adam Peart was there and then operating.

On May 10, 2001, respondents Ferro, Julie Ferro and the Ferro Family Trust filed an answer, asserting among other things the affirmative defense of assumption of risk. Respondent Jason filed an identical answer on October 10, 2001, after being served as Doe 1. On January 15, 2002, all the respondents filed a motion for summary judgment on the ground that the affirmative defense of assumption of risk acted as a complete bar to all of appellants' claims. On February 20, 2002, appellants filed opposition to the motion for summary judgment, arguing among other things that riding a Sea-Doo in a public venue was not an activity subject to the doctrine of assumption of risk; respondents were not entitled to summary judgment because there were disputed factual issues as to whether they had violated several allegedly applicable statutory duties; there were material disputed issues of fact with regard to whether respondent Ferro was subject to an additional duty not to increase the risk of harm to appellant Peart because he was instructing minor Jason in the operation of the Sea-Doo; and the primary assumption of risk doctrine had been "supplant[ed]" by a higher and independent standard of care created by the legislative enactment of sections 655, subdivision (a), 655.3, 655.7 and 658.5.

The motion for summary judgment was heard on March 15, 2002. Appellants did not offer any evidence of legislative intent with respect to the alleged statutory duties cited in their opposition to the motion for summary judgment.

On March 29, 2002, the trial court entered an order granting respondents' motion for summary judgment, on the basis of undisputed evidence showing that appellants' action was barred in its entirety and as a matter of law by the doctrine of primary assumption of risk. Citing *Record v. Reason* (1999) 73 Cal.App.4th 472 [86 Cal.Rptr.2d 547] and *Bjork v. Mason* (2000) 77 Cal.App.4th 544 [92 Cal.Rptr.2d 49], the trial court found that Sea-Doo riding was a "sport" within the meaning of that doctrine, because it was an activity akin to water-skiing or inner tubing performed "for enjoyment or thrill, [that] requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." The trial court specifically found that "[t]he existence of obstacles in the environment, such as spraying water, wakes to be crossed and other watercraft to be passed, [were] part of the thrill of the sport," and that Peart "was not using the sea-doo merely as a means of transportation." Noting that appellants had "offered no evidence that [respondents'] behavior was intentional or reckless, or increased the risks to [Peart] over and above those *inherent* in the sport," the trial court concluded that "[c]ollisions between sea-doo riders are such a

"7. As a direct and legal result of the carelessness and negligence of the [respondents], and each of them, [appellant] Adam Peart received . . . injuries. . . . [Appellant] is informed and believes and therefore alleges upon such information and belief that certain of said injuries will be permanent in nature, the extent of said permanent injuries being at this time unknown to [appellant]."

risk." Because of the sporting nature of the activity, the doctrine of assumption of risk was applicable, making immaterial any factual issue as to whether respondents were careless or negligent in operating or supervising the operation of the Sea-Doo. The trial court also found that the statutes cited by appellants manifested no intent to supersede the existing doctrine of primary assumption of risk as applied to sporting activities such as those at issue.

On April 30, 2002, the trial court entered summary judgment in favor of respondents and against appellants. This appeal was timely and properly filed from notice of entry of judgment.

## STANDARD OF REVIEW

■ Any party may move for summary judgment in any action or proceeding by contending that the action has no merit, or there is no defense to the action. (Code Civ. Proc., § 437c, subd. (a).) Code of Civil Procedure section 437c, subdivision (c), requires a trial court to grant summary judgment if all the papers and affidavits submitted, together with "all inferences reasonably deducible from the evidence" and uncontradicted by other inferences or evidence, show that "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 161 [80 Cal.Rptr.2d 66]; 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 217, p. 629.)

■ A defendant moving for summary judgment may meet the burden of showing that a cause of action has no merit by (a) negating an essential element of that cause of action; (b) establishing a complete defense to that cause of action; or (c) demonstrating the absence of any evidence to support the plaintiff's case. Once the moving defendant has met this initial burden, the burden *shifts* to the plaintiff to show the existence of a triable issue of one or more material facts with respect to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1142 [97 Cal.Rptr.2d 707]; *Sangster v. Paetkau, supra,* 68 Cal.App.4th at pp. 161–162.) A plaintiff opposing summary judgment may not rely on the pleadings alone, but must file opposition to the motion, with affidavits setting forth specific facts demonstrating that a triable issue of material fact exists as to the cause of action or defense. (Code Civ. Proc.,

§ 437c, subd. (p); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 743–746 [41 Cal.Rptr.2d 719]; 6 Witkin, Cal. Procedure, *supra,* § 201, pp. 613–614.)[3]

"On appeal, we review the trial court's decision to grant or deny the summary judgment motion de novo, on the basis of an examination of the evidence before the trial court and our independent determination of its effect as a matter of law. [Citations.] We are not bound by the trial court's stated reasons or rationale. Instead, we review the summary judgment without deference to the trial court's determination of questions of law. [Citations.] We may consider only those facts which were before the trial court, and disregard any new factual allegations made for the first time on appeal. Thus, unless they were factually presented, fully developed and argued to the trial court, potential theories which could theoretically create 'triable issues of material fact' may not be raised or considered on appeal." *(Sangster v. Paetkau, supra,* 68 Cal.App.4th at p. 163; see also *Rubenstein v. Rubenstein, supra,* 81 Cal.App.4th at p. 1143; 6 Witkin, Cal. Procedure, *supra,* § 235, pp. 646–647.)

### PRIMARY ASSUMPTION OF RISK DOCTRINE APPLIES TO ACTIVITY AT ISSUE

In this case, the trial court granted respondents' motion for summary judgment on the basis of its finding that respondents had met their burden of establishing that appellants' complaint was completely barred as a matter of law by the defense of primary assumption of risk. Appellants' central contention is that the trial court erred in applying the doctrine of primary assumption of risk to this case, because (a) respondents failed to bear their burden of establishing that the doctrine of primary assumption of risk applies to the recreational activity at issue in this case; and (b) in any case, state and federal statutes regulating the operation of personal watercraft such as Sea-Doos have abrogated the common law assumption of risk defense. We will address each of the two parts of appellants' contention in turn.

Under general principles of negligence law, "persons have a duty to use due care to avoid injury to others, and may be held liable if their careless

---

[3] "For purposes of motions for summary judgment and summary adjudication: [¶] . . . [¶] (2) A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p).)

conduct injures another person." (*Knight, supra,* 3 Cal.4th at p. 315.) Nevertheless, in certain cases of injury resulting from participation in a given activity, the doctrine of assumption of risk may operate as a complete bar to recovery "where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury." (*Id.* at pp. 314–315; see also *Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1572 [2 Cal.Rptr.3d 883] (*Whelihan*).)

The term "assumption of risk" has been used in connection with two classes of cases: those in which the issue is whether the defendant actually owed the plaintiff a duty of care (primary assumption of risk); and those in which it has been determined that the defendant breached a duty of care, and the remaining issue is whether the plaintiff chose to face the risk of harm created by the defendant's breach of duty (secondary assumption of risk). In the latter class of cases, the plaintiff's knowing and voluntary acceptance of the risk functions as a form of contributory negligence which does not operate as a complete bar to recovery, but may be resolved by applying principles of comparative fault. In the former class, on the other hand, the plaintiff's claim is completely barred as a matter of law because of a legal determination that *the defendant did not owe any duty* to protect the plaintiff from the particular risk of harm involved in the claim. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30] (*Kahn*); *Knight, supra,* 3 Cal.4th at pp. 308–315; *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1259–1260 [102 Cal.Rptr.2d 813] (*Distefano*).) In short, the doctrine of primary assumption of risk "embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk." (*Knight, supra,* 3 Cal.4th at pp. 308, 310, 314–315; see also *Kahn, supra,* 31 Cal.4th at p. 1003.)

As relevant to this case, the common law doctrine of primary assumption of risk has been used as a complete defense in personal injury lawsuits arising from any particular sports activity that "is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." (*Record v. Reason, supra,* 73 Cal.App.4th at p. 482; see also *Bjork v. Mason, supra,* 77 Cal.App.4th at pp. 550; *Whelihan, supra,* 110 Cal.App.4th at p. 1572; cf. *Shannon v. Rhodes* (2001) 92 Cal.App.4th 792, 794 [112 Cal.Rptr.2d 217] ["primary assumption of risk does not apply to bar the negligence claim of a passenger in a boat simply being used to ride around on a lake"].) " 'The overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature.' [Citation.]" (*Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1219 [130 Cal.Rptr.2d 198] (*Moser*).) Thus, the doctrine has been applied specifically to sports and

sport-related activities involving physical skill and challenges posing significant risk of injury to participants in such activities, and as to which the absence of such a defense would chill vigorous participation in the sporting activity and have a deleterious effect on the nature of the sport as a whole. (*Kahn, supra,* 31 Cal.4th at pp. 1004–1005; *Ford v. Gouin* (1992) 3 Cal.4th 339, 345 [11 Cal.Rptr.2d 30, 834 P.2d 724]; *Whelihan, supra,* 110 Cal.App.4th at p. 1569.)

■ As the Supreme Court has emphasized, application of the primary assumption of risk doctrine is "a *legal* determination that the defendant did not owe a duty to protect the plaintiff from the particular risk of harm involved in the claim. [Citation.]" (*Kahn, supra,* 31 Cal.4th at p. 1003.) Whether a given defendant owed a legal duty to protect a plaintiff from a particular risk of harm, or whether instead the primary assumption of risk doctrine is to be applied, is a question of law that "depends on the nature of the sport or activity in question and on the parties' general relationship to the activity." (*Knight, supra,* 3 Cal.4th at p. 313; see also *id.* at pp. 309, 316–317; *Kahn, supra,* 31 Cal.4th at pp. 1004–1005.)

■ In making this determination, a court looks first at the *nature* of the sporting activity at issue to determine what conditions, conduct or risks that might be viewed as dangerous in other contexts are so integral to or inherent in the activity itself that imposing a duty of care would either require that an essential aspect of the sport be abandoned, or else discourage vigorous participation therein. In such cases, defendants generally do not have a duty to protect a plaintiff from the inherent risks of the sport, or to eliminate all risk from the sport. On the other hand, defendants *do* have a duty not to *increase* the risk of harm beyond what is inherent in the sport through intentional or reckless behavior that is completely outside the range of the ordinary activity in the sport. (*Kahn, supra,* 31 Cal.4th at p. 1004; *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067–1068 [68 Cal.Rptr.2d 859, 946 P.2d 817] (*Cheong*); *Knight, supra,* 3 Cal.4th at pp. 313, 315–320.)

■ In addition to examining the inherent nature of the sport, a court must consider the *relationship* of the parties themselves to the sporting activity. Duties with respect to the same risk may vary depending on what role was played in the sporting activity by a particular defendant, whether that role be as coparticipant, passive observer, instructor, coach, owner of the venue in which the sport is played, or supplier of the equipment used in the sport. (*Kahn, supra,* 31 Cal.4th at pp. 1004–1006.) Accordingly, the general duty of due care to avoid injury to others does not apply to coparticipants in sporting activities with respect to conditions and conduct that might otherwise be viewed as dangerous but upon examination are seen to be an integral part of

the sport itself. (*Cheong, supra,* 16 Cal.4th at p. 1068; *Distefano, supra,* 85 Cal.App.4th at pp. 1259–1261.)[4]

In the recent case of *Whelihan, supra,* 110 Cal.App.4th 1566, the Court of Appeal was presented with the question whether the personal use of jet skis was an active sport to which the primary assumption of risk doctrine was applicable. Noting that previous cases had determined that the doctrine of primary assumption of risk applied to several similar personal, noncompetitive water sports (*Ford v. Gouin, supra,* 3 Cal.4th at p. 345 [water-skiing]; *Record v. Reason, supra,* 73 Cal.App.4th at pp. 475, 482 ["tubing" while being pulled by a motor boat]), the court determined that "[a]s a matter of common knowledge, jet skiing is an active sport involving physical skill and challenges that pose a significant risk of injury, particularly when it is done—as it often is—together with other jet skiers in order to add to the exhilaration of the sport by racing, jumping the wakes of the other jet skis or nearby boats, or in other respects making the sporting activity more challenging and entertaining. [Citations.] Consequently, it is the type of sporting activity that meets the criteria governing application of the doctrine of primary assumption of risk." (*Whelihan, supra,* 110 Cal.App.4th at p. 1573, fn. omitted.)

We are not persuaded by appellants' assertions that *Whelihan* was wrongly decided. Contrary to appellants' assertion, the Court of Appeal in *Whelihan* analyzed both the nature of the specific conditions, conduct or risks involved in jet skiing, and the particular role of the defendant in the activity and in relation to the plaintiff. The *Whelihan* court observed that—just as in the case

---

[4] " 'As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. (See Civ. Code, § 1714.)' [Citation.] This general rule, however, does not apply to coparticipants in a sport, where 'conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself. . . . In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant. [¶] Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, . . . defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. . . . [¶] In some situations, however, the careless conduct of others is treated as an "inherent risk" of a sport, thus barring recovery by the plaintiff.' [Citation.] Courts should not 'hold a sports participant liable to a coparticipant for ordinary careless conduct committed during the sport' because 'in the heat of an active sporting event . . . , a participant's normal energetic conduct often includes accidentally careless behavior. . . . [V]igorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct.' [Citation.]

"For these reasons, *the general test is 'that a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport.'* [Citation.]" (*Cheong, supra,* 16 Cal.4th at p. 1068, italics added, citing and quoting *Knight, supra,* 3 Cal.4th at pp. 315–316, 318, 320, fn. omitted; see also *Distefano, supra,* 85 Cal.App.4th at p. 1260.)

of other sports to which it was very similar, particularly when engaged in as a group activity—jet skiing involves certain significant inherent risks and challenges. The court specifically rejected assertions that the doctrine can be applied only to contestants in competitive events or spectator sports, noting that the Supreme Court has repeatedly found assumption of risk applicable to any active sport, whether competitive or noncompetitive. (*Whelihan, supra,* 110 Cal.App.4th at p. 1573, citing *Knight, supra,* 3 Cal.4th at pp. 320–321 and *Ford v. Gouin, supra,* 3 Cal.4th at p. 345.) The *Whelihan* court also addressed the relationship of the defendant to the plaintiff and to the activity, noting that the parties were coparticipants who had both purchased jet skis just two days before the incident, and that the plaintiff " 'was a novice jet skier, having a total of only six (6) hours of actual operating time . . . [and] no experience or familiarity with such "thrilling" maneuvers' " as those executed by the defendant. (*Whelihan, supra,* 110 Cal.App.4th at p. 1573.)

■ The decision in *Whelihan* is clearly on point with the case before us. As set out in the parties' separate statements of material facts, it is undisputed that the only significant difference between a jet ski and a Sea-Doo is that instead of having to stand up, as one does on a jet ski, a person using a Sea-Doo can sit down on a "motorcycle type" seat.[5] For our purposes, there is no legally material difference between the jet skis at issue in *Whelihan* and the Sea-Doos used in this case. We agree with *Whelihan*'s analysis of jet skiing as "an active sport involving physical skill and challenges that pose a significant risk of injury to participants in the sport," a description which applies equally to the recreational activity of riding a Sea-Doo. (*Whelihan, supra,* 110 Cal.App.4th at pp. 1569, 1573.) There is nothing in the record concerning the recreational activity of using Sea-Doos that would distinguish it in any way from other similar activities found by the courts of this state to constitute sports to which the doctrine of primary assumption of risk is applicable. ■ We conclude that, in the absence of other considerations, the doctrine of primary assumption of risk applies generally to the recreational activity of using a Sea-Doo, just as it does to other similar sports such as water-skiing (*Ford v. Gouin, supra,* 3 Cal.App.4th at p. 345), "tubing" behind a motorboat (*Record v. Reason, supra,* 73 Cal.App.4th at pp. 475, 482; *Bjork v. Mason, supra,* 77 Cal.App.4th at p. 550), jet skiing (*Whelihan, supra,* 110 Cal.App.4th at pp. 1572–1573), snow skiing (*Cheong, supra,* 16 Cal.4th

[5] In deposition testimony undisputed by appellants, respondent Ferro described stand-up jet skis and sit-down Sea-Doos as almost identical in terms of similarity of engines, and manner of forward propulsion, turning, slowing down and general maneuvering. The only difference mentioned by Ferro—aside from that between standing and sitting—was with regard to what happens when one falls off. In the case of a stand-up watercraft, Ferro stated that "the engine keeps going, and what happens is the stand-up [watercraft] automatically circles on its own . . . ." When one falls off a sit-down Sea-Doo, on the other hand, the engine stops and the machine "just sort of sits there in the water" because "you have a key that is connected to it, or you have a strap that is connected to the key."

at p. 1067), "off-roading" with a motorcycle or "dune buggy" (*Distefano, supra,* 85 Cal.App.4th at pp. 1255, 1259–1265), skateboarding (*Calhoon v. Lewis* (2000) 81 Cal.App.4th 108, 115–117 [96 Cal.Rptr.2d 394]), figure ice skating (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1632–1636 [53 Cal.Rptr.2d 657]), river rafting (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 251, 253 [38 Cal.Rptr.2d 65]), and long-distance group bicycle riding (*Moser, supra,* 105 Cal.App.4th at pp. 1218–1223).

. Appellants contend that *Whelihan* is distinguishable from this case because the roles and relationships of the parties to this incident—Ferro, Jason and Peart—differed in significant respects from those of the individuals before the court in *Whelihan*. Specifically, they assert that, unlike *Whelihan*, this case involves two minors, one of whom (respondent Jason) was a 13-year old novice operating a Sea-Doo for the first time while respondent Ferro sat behind him to supervise. We conclude that, to the extent they exist, the factual distinctions cited by appellants do not affect the applicability of the doctrine of primary assumption of risk in this case.

The ages of the parties in *Whelihan* are in fact never mentioned. On the other hand, the court did note that the plaintiff was a " 'novice' " jet skier. (*Whelihan, supra,* 110 Cal.App.4th at p. 1573.) Other cases involving comparably youth-oriented sports have either failed to mention the age of the participants at all (*Calhoon v. Lewis, supra,* 81 Cal.App.4th at pp. 110–111 [skateboarding]; *Record v. Reason, supra,* 73 Cal.App.4th at pp. 474–478, 482 ["tubing" while being pulled by a motor boat]), or essentially treated the ages of the coparticipants as irrelevant (*Bjork v. Mason, supra,* 77 Cal.App.4th at pp. 548–552 [same].) Appellants have cited no case law holding that the applicability of the doctrine of primary assumption of risk to a sporting injury turns on the age of the participants.[6]

---

[6] The recent case of *Childs v. County of Santa Barbara* (2004) 115 Cal.App.4th 64 [8 Cal.Rptr.3d 823] is not to the contrary. There, the Court of Appeal reversed a summary judgment granted to a county under the doctrine of primary assumption of risk in a lawsuit involving an 11-year-old child who had fallen and suffered serious injury while riding a small "razor" scooter over an uplifted section of public sidewalk. The court held that even though riding a scooter could be subject to the primary assumption of risk doctrine under certain circumstances, under the undisputed facts presented the child was not engaged in a sport or sports-related recreational activity but instead was playing with a toy. The court concluded that the child was not engaged in a recreation activity "for thrills and excitement," that "riding a scooter on the sidewalk is not inherently dangerous merely because a scooter rider might fall and suffer injury," and that "[t]he possibility that any person who rides a scooter, bicycle or other wheeled vehicle might be injured by the negligence of another is insufficient to impliedly excuse others from acting with due care to avoid accidents." (*Id.* at pp. 68, 70–73.) The court concluded: "The doctrine of primary assumption of risk is an exception to the rule [that all persons are legally liable for the harm caused by their fault] and completely bars recovery by an injured party irrespective of the negligence of another. If we were to apply the doctrine to

Neither does the fact Ferro was riding on the same Sea-Doo as Jason in order to supervise the minor's operation of the watercraft affect the applicability of the assumption of risk doctrine to this case. The evidence shows that despite his supervisory role, Ferro was also a coparticipant in the activity with Peart and Jason. (Cf. *Bjork v. Mason, supra,* 77 Cal.App.4th at pp. 548–552 [adult defendant drove motor boat for five "tubing" minors aged 11 to 15; despite his substantial control of the water sport, adult was a coparticipant, and his actions in driving the boat, even if negligent, were protected by assumption of risk doctrine].) Unlike the defendant swim coach in *Kahn,* Ferro was neither a coach nor a sports instructor. (*Kahn, supra,* 31 Cal.4th at pp. 997, 1004–1006.) Even if he could be construed as such—a possibility that, on this record, we reject—there would still be no basis for imposing liability on him in the absence of factual allegations and evidence showing that Ferro had acted recklessly or intentionally in such a way as to increase the risk of harm beyond those already inherent in the sport. (*Id.* at pp. 1007–1011; *Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 532 [50 Cal.Rptr.2d 671] [judo instructor's conduct was part of the inherent risk of the sport, and instructor did nothing to increase risk].)[7]

Here, appellants failed to allege recklessness in their complaint. Neither have they adduced any specific evidence of intentional or reckless actions on

---

injuries involving toys and vehicles regardless of the manner of their use, the exception would become the rule. This we decline to do." (*Id.* at p. 75.)

In short, the decision in *Childs* turned not on the age of the defendant, but on the nature of the activity and the absence of any of the policy reasons underlying the use of the doctrine of primary assumption of risk to protect the challenging nature of sports. Factually, the inherent risks of a child riding a scooter on a residential sidewalk cannot be compared to those involved in the sport of Sea-Doo riding.

[7] As the Supreme Court stated in *Kahn*: "We agree that the object to be served by the doctrine of primary assumption of risk in the sports setting is to avoid recognizing a duty of care when to do so would tend to alter the nature of an active sport or chill vigorous participation in the activity. This concern applies to the process of learning to become competent or competitive in such a sport. Novices and children need instruction if they are to participate and compete, and we agree with the many Court of Appeal decisions that have refused to define a duty of care in terms that would inhibit adequate instruction and learning or eventually alter the nature of the sport. Accordingly, we believe that the standard set forth in *Knight, supra,* 3 Cal.4th 296, as it applies to coparticipants, generally should apply to sports instructors, keeping in mind, of course, that different facts are of significance in each setting. *In order to support a cause of action in cases in which it is alleged that a sports instructor has required a student to perform beyond the student's capacity or without providing adequate instruction, it must be alleged and proved that the instructor acted with intent to cause a student's injury or that the instructor acted recklessly in the sense that the instructor's conduct was 'totally outside the range of the ordinary activity' [citation] involved in teaching or coaching the sport.*" (*Kahn, supra,* 31 Cal.4th at p. 1011, italics added.)

the part of Ferro—or any other respondent—that actually increased the risks inherent in operating a Sea-Doo sufficient to demonstrate a triable issue of material fact as to the applicability of the primary assumption of risk doctrine to this case. Nothing in the record suggests any recklessness on Ferro's part, or that he did anything so outside the range of the ordinary activity of the sport as to increase the inherent risks to Peart of operating a Sea-Doo. To the contrary, the undisputed evidence shows that Ferro's actions in supervising Jason were prudent and well within the boundaries of normal Sea-Doo riding conduct. The record shows Ferro adequately explained the basics of operating a Sea-Doo to both minors, required them to wear life jackets, and accompanied them when they went out. Jason and Ferro then simply drove their Sea-Doo in a straight line and at a moderate rate of speed without acceleration. It was in fact appellant Peart who engaged in the riskier activities of accelerating, executing turns, and cutting back and forth across the wake of respondents' Sea-Doo. Ferro did not encourage either Jason *or* Peart to take risks beyond their experience or ability. (*Record v. Reason, supra,* 73 Cal.App.4th at pp. 484–485 [even assuming driver of motor boat for "tubing" participants was speeding and making unnecessarily sharp turns, plaintiff failed to demonstrate any recklessness increasing the risks inherent in the sport]; cf. *Kahn, supra,* 31 Cal.4th at p. 1013, fn. 4 [unnecessary for plaintiff to allege defendant sports coach was reckless "because she adequately alleged facts and produced evidence sufficient to support such a conclusion"].)

Contrary to the argument in appellants' letter brief, the circumstances of this case are utterly unlike those addressed by the Supreme Court in *Kahn.* There, the record showed that the defendant swimming coach not only encouraged the novice plaintiff to take extraordinary risks beyond her ability, but actually threatened to drop her from the team if she failed to execute a dangerous dive for which he knew she was completely unprepared and of which "she had expressed a mortal fear," and that he had in fact previously promised she would not be required to undertake. (*Kahn, supra,* 31 Cal.4th at pp. 998–1000, 1011–1013, 1015.) It was this arguably intentional and reckless behavior that the *Kahn* court concluded took the case outside the range of ordinary risk inherent in the sport at issue, making the doctrine of primary assumption of risk inapplicable. Nothing in the record of this case approaches the degree of intentionally reckless behavior at issue in *Kahn.*[8]

---

[8] Similarly, respondents cannot be made liable for Peart's injuries by virtue of the fact Ferro provided the Sea-Doos on which Peart and Jason rode. Unlike the situation in *Bjork v. Mason,* appellants have not alleged or offered any evidence of equipment failure in this case. (Cf. *Bjork v. Mason, supra,* 77 Cal.App.4th at pp. 552–556 [summary judgment for defendant reversed, where he supplied all equipment used in "tubing," one piece of which failed and caused the injury at issue].)

■ In sum, we conclude that the trial court did not err in finding that the recreational Sea-Doo activity of the parties in this case constituted a sport as a matter of law, thereby making the defensive doctrine of primary assumption of risk applicable to respondents.

## No Legislative Intent to Abrogate Common Law Assumption of Risk

Nevertheless, appellants argue that the doctrine of primary assumption of risk does not apply in this case because of the enactment of legislation subsequent to the California Supreme Court's decisions in *Knight, supra,* 3 Cal.4th 296 and *Ford v. Gouin, supra,* 3 Cal.4th 339, specifically addressing and regulating the use of personal watercraft in such a way as allegedly to abrogate or supersede the doctrine, at least with respect to the kind of watercraft at issue in this case. Specifically, appellants cite the enactment of sections 655, subdivision (a), 655.7, and 655.3.[9] Appellants contend that these

---

[9] Section 655, subdivision (a), states: "No person shall use any vessel or manipulate water skis, an aquaplane, or a similar device in a reckless or negligent manner so as to endanger the life, limb, or property of any person. The department shall adopt regulations for the use of vessels, water skis, aquaplanes, or similar devices in a manner that will minimize the danger to life, limb, or property consistent with reasonable use of the equipment for the purpose for which it was designed." Violation of this statute is a misdemeanor punishable by a fine of not more than $1,000 or imprisonment in county jail for not more than six months, or by both fine and imprisonment. (§ 668, subd. (b)(3).)

Section 655.7 provides: "(c) Every personal watercraft shall, at all times, be operated in a reasonable and prudent manner. Maneuvers that unreasonably or·unnecessarily endanger life, limb, or property, including, but not limited to, jumping or attempting to jump the wake of another vessel within 100 feet of that other vessel, operating the personal watercraft toward any person or vessel in the water and turning sharply at close range so as to spray the vessel or person, or operating at a rate of speed and proximity to another vessel so that either operator is required to swerve at the last minute to avoid collision, is unsafe or reckless operation of a vessel. [¶] . . . [¶]

"(e) This section does not apply to a performer who is engaged in a professional exhibition or to a person who is participating in a regatta, race, marine parade, tournament, exhibition, or other event sanctioned by the United States Coast Guard or authorized by a permit issued by the local entity having jurisdiction over the area where the event is held." Violation of this statute is an infraction punishable by a fine of not more than $250. (§§ 655.7, subd. (f), 668, subd. (a).)

Section 658.5 provides in pertinent part: "(a) Except as provided in subdivision (b), no person under 16 years of age shall operate a vessel powered by a motor of greater than 15 horsepower . . . .

"(b) Except as provided in subdivision (a), no person 12, 13, 14, or 15 years of age shall operate a vessel powered by a motor of greater than 15 horsepower . . . unless the person is accompanied in the vessel by a person who is at least 18 years of age and who is attentive and supervising the operation of the vessel.

"(c) Subdivisions (a) and (b) do not apply to any of the following:

"(1) A person who operates a vessel as a performer in a professional exhibition.

"(2) A person engaged in an organized regatta, vessel race, or water ski race.

statutes "govern the operation of personal watercraft by minors in California," establish specific duties of care inconsistent with the primary assumption of risk doctrine, impose criminal penalties, and thereby necessarily give rise to civil liability for their violation pursuant to Evidence Code section 669.[10] The court in *Whelihan* specifically addressed and rejected these contentions, at least with respect to two of these statutes (§§ 655, subd. (a), 655.7). We agree with its analysis, which we find equally applicable to the other statutory provisions upon which appellants rely.

The courts of this state have repeatedly affirmed that statutory provisions like those at issue do not abrogate, supersede or displace the primary assumption of risk doctrine unless the legislative authority has explicitly and unambiguously manifested a clear intent to do so. (*Cheong, supra,* 16 Cal.4th at pp. 1069–1070; *id.* at p. 1074 (conc. opn. of Kennard, J.); *id.* at p. 1079 (conc. opn. of Chin, J.) [ordinance delineating duties of skiers did not abrogate primary assumption of risk doctrine as applied to sport of skiing]; *Moser, supra,* 105 Cal.App.4th at pp. 1225–1226 [Vehicle Code provisions designed to protect persons using public roads do not nullify plaintiff's assumption of risk in participating in organized long-distance bicycle ride]; *Distefano, supra,* 85 Cal.App.4th at pp. 1266–1267, 1271–1274 [statutory provisions proscribing driving off-road vehicles at unreasonable or unsafe speed, or with willful and wanton disregard for the safety of persons or property, did not evince any legislative intent to supersede or modify assumption of risk doctrine and "thus do not impose on participants in the

---

"(3) A person engaged in a marine event authorized pursuant to Section 268.

"(d) Any person who violates this section, and any person who permits any other person under 16 years of age to operate a vessel in violation of this section, is guilty of an infraction."

Section 655.3 provides: "The department may adopt regulations to establish and maintain for the use of vessels and the equipment on vessels on the waters of this state rules of the road and pilot rules in conformity with those contained in the federal navigation laws or the navigation rules promulgated by the United States Coast Guard." (Boldface omitted.) A violation of any regulation adopted pursuant to this section other than those relating to vessel equipment requirements is guilty of a misdemeanor punishable by a fine of not more than $100 or imprisonment in the county jail for not more than five days, or both fine and imprisonment. (§ 668, subd. (b)(1).) Pursuant to this statute, the Department of Boating and Waterways adopted and incorporated by reference the rules of the road and pilot rules promulgated by the United States Coast Guard. (Cal. Code Regs., tit. 14, § 6600.1, subd. (a).)

[10] Evidence Code section 669 provides in pertinent part: "(a) The failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."

sport of off-roading a higher or different duty in tort than is established under *Knight*"].)[11] Appellants have cited us to no cases inconsistent with this view, and there apparently are none.[12]

---

[11] "As relevant, [Evidence Code] section 669[, subdivision] (a) states, 'The failure of a person to exercise due care is presumed if' four requirements are met. This statute, however, does not establish tort liability. Rather, it merely 'codifie[s]' the rule that 'a presumption of *negligence* arises from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm which the plaintiff suffered as a result of the violation of the statute.' [Citations.] Under *Knight*, however, a presumption of negligence is insufficient to make a participant in an active sport liable in tort to another participant.

". . . [Evidence Code S]ection 669[, subdivision] (a) states a rule of evidence only—a presumption of the failure to use 'due care'—not a rule of tort liability. The word 'duty' does not appear in the statute. *Knight* held that a participant in an active sport may sue a fellow participant only for reckless behavior or the intentional infliction of injury, and not for mere negligence. [Citation.] By establishing only a standard of negligence, [Evidence Code] section 669[, subdivision] (a) does not apply to cases that *Knight* governs. . . . Because, 'As a general rule, persons have a duty to use *due care* to avoid injury to others, and may be held liable if their careless conduct injures another person' [citations], as a general rule a presumption of the failure to use '*due care*' [citation] is also a presumption of a breach of duty giving rise to tort liability. But the basic teaching of *Knight* is that participants in an active sport have no duty to avoid merely negligent conduct.

"Primary assumption of risk involves ' " ' a *reduction* of defendant's duty of care.' " ' [Citations.] Specifically, primary assumption of risk reduces the general duty to use 'due care' (or not act negligently) to a duty not to act intentionally or recklessly. If, as the Law Revision Commission Comment to [Evidence Code] section 669 states, the section's presumption is of simple negligence only, and not of gross negligence, it is certainly not a presumption of intentional or reckless conduct. The *Knight* standard of primary assumption of risk still applies even if the violation of an ordinance or statute, combined with Evidence Code section 669, creates a presumption of negligence.

". . . The Legislature clearly has the power to modify *Knight*, but whether a particular statute has done so must be determined from that statute itself, not merely by determining whether the four elements of [Evidence Code] section 669[, subdivision] (a) are met." (*Cheong, supra*, 16 Cal.4th at pp. 1078–1079 (conc. opn. of Chin, J.).]

Following the analysis set out in the concurrence of Justice Chin in *Cheong*, with which a majority of the present Supreme Court now agrees, the court in *Distefano* held that the basic speed law provisions of Vehicle Code section 38305 did not supersede the *Knight* primary assumption of risk doctrine to impose on participants in the sport of off-roading a higher or different duty than that established under *Knight*—even if an off-roading participant's violation of Vehicle Code section 38305, in combination with Evidence Code section 669, did create a presumption of negligence—because the statute itself evinced no intention by the Legislature "to modify or abrogate the *Knight* rule." (*Distefano, supra*, 85 Cal.App.4th at pp. 1272–1273.)

[12] "Because a majority of the current Supreme Court justices have expressed the view that a violation of a statute that indicates no legislative intent to eliminate the assumption of risk defense does not displace the primary assumption of risk doctrine, and because there are no cases inconsistent with that view, we adopt the *Distefano* court's conclusion. [Citation.] Although the facts show that [defendant] violated provisions of the Vehicle Code designed to protect persons using public roads, based on our conclusion as to the present state of the law, such violations do not nullify [plaintiff's] assumption of the risk." (*Moser, supra*, 105 Cal.App.4th at p. 1226.)

Although appellants argue that the Legislature's enactment of the subject statutes after the Supreme Court's decision in *Knight* demonstrates its intention to abrogate the primary assumption of risk doctrine in connection with personal water craft, the fact the statutes nowhere *state* such an intent leads us to the opposite conclusion. The Legislature was clearly aware of the existing state of the law, particularly in light of the earlier decision in *Ford v. Gouin, supra,* 3 Cal.4th 339 applying the primary assumption of risk doctrine to the sport of water-skiing, one of the activities *specifically singled out* in the subject legislation. (§§ 655, subd. (a), 658.5, subd. (c)(2).) Certainly, if the Legislature had intended to supersede this well-known common law doctrine, it would have said so. Because the subject statutes do not demonstrate a clear intent to abrogate or modify the existing common law doctrine of primary assumption of risk with respect to water sports such as jet skiing and operating a Sea-Doo, we cannot construe them to do so. (*Whelihan, supra,* 110 Cal.App.4th at p. 1575; *Moser, supra,* 105 Cal.App.4th at p. 1226.)

In connection with their argument, appellants have sought judicial notice of portions of the legislative history of the subject statutes, none of which was introduced below before the trial court. Respondents have opposed this motion. We now take judicial notice of these materials. (Evid. Code, §§ 452, 459; *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, & fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513] [courts will take judicial notice of statutory legislative history in order to ascertain purpose and meaning of ambiguous statute]; *Larson v. State Personnel Bd.* (1994) 28 Cal.App.4th 265, 270, & fn. 2 [33 Cal.Rptr.2d 412] [appellate courts have discretion to take judicial notice of any matter specified in Evidence Code section 452, including official acts of the legislative and executive departments].) Although there is a great deal in this legislative history expressing concern over the risks and dangers of unregulated personal watercraft use and an intent to establish fines and penalties for unsafe operation thereof, there is nothing evidencing any clear legislative intent to overturn existing precedent and abrogate the civil doctrine of assumption of risk as it has been applied to numerous other water sport activities utilizing such personal watercraft. Indeed, the proffered materials contain no reference to civil liability at all.

Appellants contend that, precisely because these statutes regulate the kinds of watercraft activities involved in this case and establish new criminal sanctions on negligent or reckless operation of watercraft such as Sea-Doos, they also impose different and higher civil duties of care on individuals engaged in such activities than have heretofore been imposed under the common law. In effect, appellants want this court to reject the settled law in this state and find that legislative enactments may abrogate the common law doctrine of primary assumption of risk without expressly stating any intent to do so. Adoption of appellants' arguments would not simply abrogate the doctrine of primary assumption of risk in this case alone. If the statutes at

issue impose new duties of care on individuals operating Sea-Doos like the parties in this case, they would necessarily also impose such duties on individuals engaged in other similar personal watercraft sports, including water-skiing. We believe that if the Legislature had intended such an extension of civil liability and wholesale overturning of established decisional law, it would have said so explicitly.

Appellants nevertheless insist that the Legislature manifested its intent to abrogate the primary assumption of risk doctrine in these statutes by expressly *excluding* certain organized watercraft competitions, regattas, races and similar sporting events from their regulatory provisions in sections 655.7, subdivision (e) and 658.5. Without any evidence, appellants assert that the Legislature meant to *retain* the applicability of the assumption of risk defense in those exceptional circumstances. Based on this asserted premise, appellants argue the Legislature *impliedly* intended to *exclude* the defense with respect to the other activities which the statutes were intended to regulate. Appellants' assertion is without merit. The cited provisions simply manifest the Legislature's intent not to impose *criminal* sanctions or age-specific operational limitations on otherwise high-risk operation of personal watercraft in the specified organized sport venues. There is absolutely no mention of civil liability or the defense of assumption of risk whatsoever, one way or the other. In the absence of any express legislative intent, appellants' assumption that the Legislature meant to limit the assumption of risk doctrine to these particular competitive and exhibition sport situations and exclude it in others is just that—an unwarranted assumption.

In sum, we hold that the activity at issue in this case—operating a Sea-Doo—is a type of sporting activity that meets all the criteria governing application of the doctrine of primary assumption of risk. We further hold that the Legislature's enactment of various statutes regulating the operation of personal watercraft was not intended to abrogate or preempt the existing common law. Because primary assumption of risk is a complete defense to this action, the trial court properly granted summary judgment on that basis.

### Appellants Have Failed to Establish Any Triable Issue of Material Fact

Finally, even if the cited statutes and regulations could be interpreted as imposing a form of civil duty and liability unaffected by the common law defense of assumption of risk, we would still be required to affirm the trial court's judgment. Simply put, appellants have failed to carry their burden of establishing a triable issue of material fact as to whether respondents violated any of the statutes alleged. (Code Civ. Proc., § 437c, subd. (p)(2).)

The *undisputed* evidence shows that Ferro and Jason drove their Sea-Doo in a straight line, at a moderate speed, without accelerating or executing any sharp turns or dangerous maneuvers. Although they ultimately collided with appellant Peart, the record shows this was not because of negligence or recklessness on their part, but was instead due to Peart's own maneuvers and turns perilously close to Ferro and Jason's craft, and despite Ferro's efforts to signal Peart to move further away from them. The proximate cause of the collision was Peart's attempt to execute a 180-degree turn *directly in front of the Sea-Doo operated by Ferro and Jason*. On this record, appellants have failed to establish any triable issue of fact as to whether Ferro and Jason operated their own Sea-Doo in a reckless or negligent manner (§ 655, subd. (a)), or unreasonably or unnecessarily endangered life, limb, or property by purposely maneuvering their Sea-Doo close to Ferro (§ 655.7, subd. (c)). Neither is there any triable issue as to the fact Ferro properly observed the law by accompanying and supervising 13-year-old Jason on his Sea-Doo (§ 658.5, subd. (b)).

In short, even if we were to conclude that the Legislature intended that a violation of these statutes would preclude application of the doctrine of assumption of risk, we would affirm the grant of summary judgment because of appellants' failure to establish any triable issue of material fact as to whether respondents violated the specific provisions of the statutes at issue.

### DISPOSITION

The judgment is affirmed. Appellants shall pay respondents' costs on this appeal.

Parrilli, J., concurred.

**POLLAK, J.**—I concur in the majority opinion. I write separately only to emphasize the anomaly of the result we reach. Under the plurality opinion in *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*), the conclusion that plaintiff's claim is barred by primary assumption of the risk rests upon the determination that defendants' conduct created only risks that are inherent in the recreational operation of a Sea-Doo which, as a matter of law, defendants had no duty to avoid. Despite the enactment of legislation imposing a duty upon persons operating a personal watercraft not to do so "at a rate of speed and proximity to another vessel so that either operator is required to swerve at the last minute to avoid collision" (Harb. & Nav. Code, § 655.7, subd. (c)), we hold, in effect, that the risks created by conduct in violation of this statute are inherent in the recreational operation of a Sea-Doo, and that one who violates this statute was under no duty to refrain from doing so. Putting aside the anomaly of saying that one has no

duty to comply with a duty prescribed by statute (which may be attributed to the manner in which the assumption of risk doctrine was articulated by the *Knight* plurality), what is more disconcerting is the conclusion that violations of the statute are "inherent in the sport itself" (*Knight, supra*, 3 Cal.4th at p. 315), for which reason such violations can give rise to no civil liability. In determining what is "inherent" and acceptable conduct in a sporting activity, one would suppose that the courts would insist on compliance with the law. In determining what conduct is "totally outside the range of the ordinary activity involved in the sport" (*id.* at pp. 320–321), one would suppose that conduct that a statute prohibits would not be accepted by the courts as ordinary and therefore immune from civil liability.

Nonetheless, despite the "divergent pronouncements of the California Supreme Court in *Ford* [*v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724]], *Knight, supra,* 3 Cal.4th 296, and *Cheong* [*v. Antablin* (1997) 16 Cal.4th 1063 [68 Cal.Rptr.2d 859, 946 P.2d 817]] concerning the questions of duty and assumption of risk in a sports setting" (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1267 [102 Cal.Rptr.2d 813]), and the Supreme Court's failure thus far to "conclusively determine[] whether or not a violation of law can displace the primary assumption of risk doctrine" (*Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1225 [130 Cal.Rptr.2d 198]), the appellate courts have adopted the rule articulated in the majority opinion. "[T]he enactment of statutes such as [Harbors and Navigations Code] section 655, subdivision (a), and section 655.7, subdivision (c), should not be construed to abrogate the doctrine of primary assumption of risk unless the language of the statute explicitly demonstrates a 'clear intent' to do so." (*Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1575 [2 Cal.Rptr.3d 883], citing *Cheong v. Antablin, supra,* 16 Cal.4th at p. 1069, *Moser v. Ratinoff, supra,* 105 Cal.App.4th at p. 1226, & *Distefano v. Forester, supra,* 85 Cal.App.4th at p. 1274.) Despite my misgivings concerning the rule that has emerged, I believe that any attempt by an intermediate appellate court to rearticulate, much less revise, the governing rules at this time would simply inject additional confusion into this area of the law. If these principles are to be restated, it is for the Supreme Court or the Legislature to do so.

A petition for a rehearing was denied June 22, 2004, and appellants' petition for review by the Supreme Court was denied September 1, 2004. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.