IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| NEYDIN GASPAR, on behalf of the ESTATE OF LENIN ESTRADA SALGADO, | ) ) ) ) | No. 40362-9-III |
| Appellant/Cross Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| THE LAST RESORT OPERATIONS, LLC, a Washington corporation, | ) ) ) ) | |
| Respondent/Cross Appellant. | ) | |

MURPHY, J. — Two hours after last being seen preparing to ride a jet ski on Lake Cle Elum, Lenin Estrada Salgado (Salgado) was found drowned. Salgado and his family had rented jet skis from The Last Resort Operations, LLC (Last Resort). Salgado's estate, through Neydin Gaspar (the Estate), sued Last Resort for negligence on the basis that the day's wind speeds warranted a "small craft advisory" that "mandated ceasing all operations" or, alternatively, that Last Resort failed to warn "of the imminent and dangerous weather conditions," and failed to ensure properly fitted safety gear. Clerk's Papers (CP) at 5.

The trial court granted summary judgment to Last Resort and dismissed the Estate's complaint. We affirm.

FACTS

With the trial court dismissing the Estate's claims through summary judgment, the facts are recounted in the light most favorable to the Estate as the nonmoving party. *Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 487, 834 P.2d 6 (1992) (citing *Young v. Key Pharms. Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989)).

In August 2022, Salgado, age 33, and his family vacationed near Lake Cle Elum. Prior to the trip, they reserved two jet skis from Last Resort for all-day use on August 27, 2022. On the morning of August 27, Salgado, his mother, and his sister, arrived at Last Resort's shop to pick up the jet skis. While there, Salgado reviewed and signed a rental safety checklist approved by the Washington State Parks and Recreation Commission, a prerequisite to renting a jet ski. The checklist emphasized the importance of always wearing a life jacket and avoiding aggressive maneuvers or jumping waves, among other safety warnings. Salgado was fitted with a life jacket, and the family was provided with six additional jackets. After completing the paperwork, an employee from Last Resort towed two jet skis to Speelyi Beach on the south end of Lake Cle Elum, a location requested by Salgado and his family.

At the beach launch, Last Resort employee Kyle Groves (Groves) instructed Salgado on the operation of the jet ski. Groves explained the jet ski's controls, how to safely beach and launch the jet ski, and how to approach waves at an angle rather than

head on. Groves observed that Salgado appeared excited to ride the jet ski. After Groves

departed, Salgado told his sister he was going to use the jet ski while she and their mother

returned to the rental house. Before leaving, Salgado's mother saw Salgado put on a blue

life jacket, but she did not witness him ride away on the jet ski.

At 10:45 a.m., Salgado's sister and father returned to Speelyi Beach but did not

see Salgado at the beach or on the water. Salgado's father took out the second jet ski to

search for his son. After riding on the west, north, and east shores of the lake for

approximately 30 minutes, Salgado's father located the jet ski floating in the water near

the shore. Salgado's father returned to Speelyi Beach where Salgado's brother joined his

father in the search. Eventually, Salgado was located face down in the water. According

to the report of first responders, Salgado's body had been located "floating in the water,

near the shore, a short ways away from the jet ski. His life jacket was found floating

separately near by." CP at 129. As documented in the Kittitas County Coroner's Office

report,

> family members found Salgado face down in shallow water on the beach
> approx[imately] 400 feet [northeast] of the boat ramp area. He was not
> wearing the personal flotation device that he had on earlier. The personal
> flotation device was found washed up on the beach approx[imately] 100
> feet away. The personal flotation device was still buckled, but had come
> off [Salgado] before he was found.

CP at 134. It was determined that Salgado died by drowning.

3

According to reports prepared by investigating law enforcement officers, "the 'weather conditions were in the 60s, the wind was blowing about 20-25 miles per hour and gusting higher at times. The lake was white capping with 3- and 4-foot waves at times.'" [1] CP at 2. Additionally, an investigating officer determined:

> "CONCLUSION [Salgado] took a rental PWC [personal watercraft] out for a ride on Lake Cle Elum while waiting for his family to return to the beach. His mother stated when he left the beach with the PWC he was wearing a life jacket. At some point [Salgado] fell off or was ejected from the machine. The incident was not witnessed by anyone. About an hour later [Salgado] was found face down in the water and was unresponsive along the beach. The life jacket was upwind of [Salgado] on the beach and the PWC was located down wind of [Salgado] on [the] beach. Lifesaving measures were performed on [Salgado] but he did not recover. Coroner stated the cause of death was a fresh water drowning."

CP at 4 (boldface omitted).

*Procedural background*

In the complaint, the Estate averred that Last Resort was negligent in renting the jet skis under conditions justifying a "small craft advisory" that should have resulted in a "mandated ceasing [of] all operations." CP at 5. In the alternative, the Estate asserted that Last Resort failed to warn Salgado "of the imminent and dangerous weather conditions"

---

[1] In the record on review, repeated references are made to information contained in reports from the Kittitas County Sheriff's Office. The actual reports from the sheriff's office are not, however, included in the record before us. Our recitation of facts includes information presented by the Estate, that is attributed to law enforcement, to be consistent with the principle that this court considers facts on summary judgment in the light most favorable to the nonmoving party.

and, further, that Last Resort "failed to ensure that [Salgado] had properly fitted safety gear."[2] CP at 5.

Last Resort moved for summary judgment dismissal of the Estate's claims on the basis that Salgado "assumed the inherent risks of jet skiing alone on a mountain lake," with the doctrine of implied primary assumption of risk relieving Last Resort of "the duty to warn of risks inherent in a sport." CP at 6. Additionally, Last Resort argued the Estate could not establish causation due to insufficient evidence as to how Salgado entered the water or why he drowned.

In opposition to summary judgment, the Estate submitted declarations from Stein Gabrielsen (Gabrielsen) and Lane Bowers (Bowers), who offered opinions on the operation of personal watercraft (PWC). Gabrielsen relied on weather data from the city of Cle Elum, located approximately seven nautical miles from the lake, to conclude:

> 16. It is my opinion that [Last Resort] was grossly negligent by renting the jet skis under conditions that justified a small craft advisory which should have mandated ceasing all operations.
> 17. In the alternative, [Last Resort] was grossly negligent by failing to warn [Salgado] of the imminent and dangerous weather conditions as, at a minimum, would be expected as customary within the field by any watercraft expert in the process of renting jet skis or other PWC.

---

[2] A wrongful death cause of action under RCW 4.20.010 was not pleaded in the Estate's complaint, but based on the summary judgment briefing it appears the Estate abandoned any claim related to Salgado's safety gear.

CP at 151, 155-56.

Gabrielsen defined "small craft advisory" as "wind speeds of 21 to 33 knots . . . expected to produce hazardous wave conditions to small craft," which is a definition he attributed to the National Weather Service. CP at 151 (capitalization omitted). Gabrielsen opined that "PWC rental companies normally only rent below small craft conditions, and normally supervise the rentals in a predetermined area of the water marked on a map or with buoys the renters are required to ride inside of." CP at 151-52. Gabrielsen also stated, "It is [an] expected practice within the field of watercraft safety to monitor weather conditions and make continuous judgments about the safety, or not, of engaging in water sports under current conditions." CP at 153.

Bowers similarly emphasized the danger posed by Last Resort's failure to warn jet ski renters of the approaching high-wind conditions.

> 3. A key safety aspect in relation to proper PWC operations, including jet skis, is to monitor the weather conditions prior to engaging in the sport.
> 4. It is ill advised to operate a jet ski or any PWC during winds that rise to the level of a small craft advisory.
> 5. The weather records demonstrate that on the day of the death involved in this case the impending winds warranted ceasing all jet ski operations.
> 6. To the extent that a PWC (including [jet] ski rental company) opts to provide rentals under the weather conditions at issue, it is customary within the field to, at a minimum, warn the renters of the upcoming winds and associated hazards associated with a small craft advisory level of winds.

7. Monitoring the weather is standard practice for all marine operations to ensure the safety of the individuals involved.

8. The obligation and practice of warning rental patrons is of heightened importance given the likelihood that any individual renting a PWC is not familiar with the weather risks.

CP at 143-44.

Last Resort moved to strike the declarations of both Gabrielsen and Bowers on the basis that the opinions lacked foundation, engaged in speculation, were conclusory, and were presented by witnesses unqualified to offer expert testimony. Last Resort argued that neither Gabrielsen nor Bowers based their opinions on the weather conditions at Lake Cle Elum, instead relying on weather data from the city of Cle Elum, which is different from Lake Cle Elum due to distance and geography.

Last Resort submitted a declaration from Charles Hawley (Hawley), a marine industry consultant who noted that the personal flotation device used by Salgado had a model rating of 50 m.p.h., meaning the vest should not sustain damage as a result of impacting the water up to 50 m.p.h. According to Hawley, the personal flotation device worn by Salgado was appropriate and suitable for the SeaDoo Spark model jet ski that Salgado was riding, that can be safely operated in wave heights of two meters (6.6 feet) and windspeeds of 33 knots (38 m.p.h.).

The Hawley declaration was submitted in conjunction with a declaration by Patrick Hudson, Ph.D., P.E. (Hudson), an engineer who reviewed wind speed data from

a weather station near Lake Cle Elum and determined that: (1) the conditions on August 27, 2022, did not warrant a small craft advisory as defined for the state of Washington, and (2) a small craft advisory was not actually issued. Hawley indicated that the threshold for the National Weather Service to issue a "small craft advisory" in Washington is "[s]ustained winds of 21 to 33 knots [24 to 38 mph], and/or wave heights exceeding 10 feet (or wave steepness values exceeding local thresholds)," with "sustained winds" described as "the average wind speed over a two-minute period." [3] CP at 219 (alterations in original) (footnote omitted). Hudson reviewed data from the public wind monitoring station closest to Lake Cle Elum, which is a Bureau of Reclamation HydroMet weather station, located approximately .75 miles from Speelyi Beach, where Salgado launched the jet ski, and 1.2 miles from where Salgado was eventually found. During the two hours between the time that Salgado left Speelyi Beach until he was found, sustained winds

---

[3] Patrick Hudson further indicated:

> A "Small Craft Advisory" is an advisory issued by coastal and Great Lakes Weather Forecast Offices (WFO) of the National Weather Service for areas included in the Coastal Waters Forecast or Nearshore Marine Forecast products. Thresholds governing the issuance of small craft advisories are specific to geographic areas.
> . . . .
> The National Weather Service does not monitor the wind conditions at Lake Cle Elum—thus, there was no Small Craft Advisory in effect on August 27, 2022.

CP at 219 (footnote omitted).

were measured between 11.2 and 23.7 m.p.h. Hudson compared his research to the wind data relied on by Gabrielsen and Bowers that was taken from the city of Cle Elum, situated approximately seven nautical miles from the southernmost end of Lake Cle Elum, where Speelyi Beach is located, and not representative of wind speeds at the lake due to distance and geography. Hudson also reviewed photographs taken the day of the incident that included waves on the lake and opined that none appeared to be greater than two feet high.

In support of its motion to strike, Last Resort further argued that neither Gabrielsen nor Bowers had experience with jet ski rentals and that Gabrielsen's theory that "Salgado was most likely involved in some sort of incident that included an unexpected jettison from the jet ski," CP at 156, was speculative because Gabrielsen did not even analyze Salgado's life jacket. The trial court denied the motion to strike the declarations of Gabrielsen and Bowers.

The trial court granted summary judgment to Last Resort. Citing *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 398 P.3d 1205 (2017), the trial court concluded that jet skiing on a mountain lake is inherently dangerous and the doctrine of implied primary assumption of risk applied. The court further found that the Estate could not establish causation:

> The problem is we just don't know what it is that caused [Salgado]
> to come off of his jet ski, and we don't know whether he was actually

wearing his life jacket. I mean, we do have one person who's an expert on life jackets saying it's pretty unlikely that anything happened to make [Salgado] suddenly lose his life jacket while he's in the water. So we don't know. We don't know whether he took it off and just buckled it back up so that it was—it was buckled around something, because it had the lanyard on it so it presumably needed to stay with the jet ski itself so the jet ski would stay on. I think that's how those work. Although that—nobody talked about the significance of the lanyard either, so that's actually speculation by the Court.

I don't know. I mean, my problem is that there just simply isn't enough information about what happened and why [Salgado] ended up dying in the middle of this mountain lake. And as I said, it's a terrible tragedy and we'd like to know how to fix that, but I just don't see that . . . Last Resort is the proper—proper way to do it. Because we can't say that, in fact, the wind is what caused this to happen.

Rep. of Proc. (RP) (Apr. 5, 2024) at 26-27.

The court also recognized that because no small craft advisory was issued for Lake Cle Elum, and no evidence was presented that the wind speeds on Lake Cle Elum rose to the level of a small craft advisory, there was no duty by Last Resort "to warn of an event that didn't happen had anything to do with [Salgado's] death." RP (Apr. 5, 2024) at 27-28.

The Estate appeals the trial court's grant of summary judgment. Last Resort cross appeals the trial court's denial of its motion to strike the declarations of Stein Gabrielsen and Lane Bowers.

10

No. 40362-9-III
*Gaspar v. Last Resort Operations, LLC*

ANALYSIS

*Standard of review*

We review de novo an order granting summary judgment, engaging in the same inquiry as the trial court. *Genie Indus., Inc. v. Market Transp., Ltd.*, 138 Wn. App. 694, 700, 158 P.3d 1217 (2007); s*ee* CR 56(c). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 797, 123 P.3d 88 (2005). The moving party has the initial burden of establishing its right to judgment as a matter of law, and once that is satisfied, the burden shifts to the nonmoving party to show a genuine issue of material fact for trial. *See Welch v. Brand Insulations, Inc.*, 27 Wn. App. 2d 110, 114-15, 531 P.3d 265 (2023). We view all evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Johnson v. Wash. State Liquor & Cannabis Bd.*, 197 Wn.2d 605, 611, 486 P.3d 125 (2021).

*Summary judgment*

To prevail on its negligence claim, the Estate must show that Last Resort (1) owed a duty of care to Salgado, (2) breached that duty, (3) a resulting injury occurred, and (4) the breach was a proximate cause of the injury. *See N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 429, 378 P.3d 162 (2016). The existence of a duty is a question of law.

11

*See Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 128, 875 P.2d 621

(1994). The fact of Salgado's death, alone, is insufficient to establish breach of a duty,

as negligence cannot be inferred from the mere fact that an injury occurred. *See Hansen*

*v. Wash. Nat. Gas Co.*, 95 Wn.2d 773, 778, 632 P.2d 504 (1981) (The occurrence of

an injury is insufficient to prove the existence of a dangerous condition and establish

liability.). "Breach and proximate cause are generally issues for the trier of fact, but

the court may resolve them as a matter of law 'if reasonable minds could not differ.'"

*Vargas v. Inland Wash., LLC*, 194 Wn.2d 720, 730, 452 P.3d 1205 (2019) (quoting

*Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999)).

    *Implied primary assumption of risk*

    Under Washington law, the doctrine of implied primary assumption of risk applies

to recreational activities and bars recovery in situations in which a participant voluntarily

encounters known, inherent risks of the activity. *See Taylor v. Baseball Club of Seattle,*

*LP*, 132 Wn. App. 32, 37-38, 130 P.3d 835 (2006). This doctrine recognizes that certain

risks are so integral to the activity that a defendant owes no duty to eliminate or warn

against them, provided they are open and obvious. *See Scott*, 119 Wn.2d at 497-503

(application of the doctrine to negligence claim arising out of skiing accident). "'With

express assumption of risk, the plaintiff states in so many words that [they] consent[]

to relieve the defendant of a duty the defendant would otherwise have. With implied

primary assumption of risk, the plaintiff engages in other kinds of conduct, from which

consent is then implied.'" *Hvolboll v. Wolff Co.*, 187 Wn. App. 37, 48, 347 P.3d 476

(2015) (quoting *Erie v. White*, 92 Wn. App. 297, 303, 966 P.2d 342 (1998)).

> It is not so much a finding of "fault" on the part of the plaintiff as a
> recognition that the plaintiff willingly relieved the defendant of a duty
> of care that [they] would otherwise owe. Thus, if the plaintiff's claim is
> based solely on a risk that was expressly assumed, there can be no
> negligence and consequently no liability.

16 DAVID K. DEWOLF AND KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND

PRACTICE § 9:12, at 485 (5th ed. 2020-21).

Jet skiing is a recreational water activity with well-recognized inherent risks,

including drowning, collisions with water, and hazards from natural conditions such as

wind, waves, and currents. *See, e.g.*, *Truong v. Nguyen*, 156 Cal. App. 4th 865, 67 Cal.

Rptr. 3d 675 (2007) (applying primary assumption of risk to bar recovery in jet ski

passenger death, noting water-based recreation's inherent dangers). In the absence of

direct authority in Washington on application of the doctrine to jet ski use, we find this

California authority to be persuasive.

"Under . . . implied primary assumption of risk, [a] defendant must show that

[the] plaintiff had full subjective understanding of the specific risk, both its nature

and presence, and that [they] voluntarily chose to encounter the risk." *Taylor*, 132 Wn.

App. at 38 (citing *Brown v. Stevens Pass, Inc.*, 97 Wn. App. 519, 523, 984 P.2d (1999)).

Here, the undisputed facts establish that Salgado impliedly assumed the risks at issue. He was an adult who voluntarily rented the jet ski, observed the lake conditions (including the wind level and wave heights), fully fastened his life jacket, and proceeded onto the water. Accepting as true the Estate's submission that the sustained winds on the lake were 20 to 25 m.p.h. and resulted in 3- to 4-foot waves, these conditions were open and obvious to any person when operating a personal watercraft on an exposed mountain lake.

Last Resort asserts it had no duty to warn or protect Salgado from injury because he voluntarily participated in an outdoor recreational activity that carried an inherent risk of drowning. Last Resort highlights that: (1) Salgado had prior jet ski experience, (2) Salgado acknowledged that he understood the specific risks of jet skiing, and (3) a label located between the jet ski's handlebars warned of potential injury or death. Last Resort's employees do monitor weather for thunder and lightning, and will notify customers of the conditions and recommend they get off the water, but allow jet ski users themselves to decide what wind speed they are comfortable handling. "Assumption follows from hazards the plaintiff voluntarily assumes because of the thrill and enjoyment of an activity." *Pellham*, 199 Wn. App. at 419. Wind gusts and waves are expected on mountain lakes, which is a reason people enjoy engaging in activities like jet skiing on these lakes. "There is no duty to warn of the presence of natural transitory conditions."

*Id*. at 412 (citing *DeWick v. Village of Penn Yan*, 275 A.D.2d 1011, 713 N.Y.S.2d 592, 594 (2000)).

Based on the circumstances and known actions of Salgado, the evidence shows that Salgado had a full understanding of the specific risks involved in going jet skiing and voluntarily chose to encounter those risks. With both *express* and *implied primary* assumption of risk, "[t]he evidence must show the plaintiff (1) had full subjective understanding (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter the risk." *Kirk v. Wash. State Univ.*, 109 Wn.2d 448, 453, 746 P.2d 285 (1987). "'In the usual case, [a participant's] knowledge and appreciation of the danger will be a question for the jury; but where it is clear that any person in [their] position must have understood the danger, the issue may be decided by the court.'" *Brown*, 97 Wn. App. at 523 (citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 68, at 489 (5th ed. 1984)); *see also Pellham*, 199 Wn. App. at 413. In this case, Salgado made a personal choice to recreate on a mountain lake with a rented jet ski and to operate that jet ski alone after observing the weather and lake conditions.

The trial court rightly granted summary judgment based on implied primary assumption of risk.

### *Duty of care/breach*

The Estate argues that Last Resort had a duty to cease all jet ski rental operations

on August 27, 2022, or alternatively, to warn jet ski users of the wind conditions. However, Washington law does not impose such a duty on rental operators for recreational users where the risks are inherent and observable. *See Pellham*, 199 Wn. App. at 409 (holding inner tube rental company had no duty to warn of the danger of fallen trees in the water as that is an inherent risk in tubing). Small craft advisories are typically issued by governmental bodies like the National Weather Service for broader navigational warnings and are not mandated for private companies. There is no evidence that a small craft advisory was issued by any governmental entity relative to Lake Cle Elum on August 27, 2022.

The Estate's assertion that the wind at Lake Cle Elum "justified a small craft advisory," CP at 5, is not supported by the evidence. "[T]he moving party has the burden of showing there is no genuine issue of material fact, but this does not relieve the nonmoving party of the burden of producing evidence that would support a genuine issue for trial." *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 132, 769 P.2d 298 (1989). "The nonmoving party must set forth specific facts showing a genuine issue and cannot rest on mere allegations." *Id.*

Here, in support of its motion for summary judgment, Last Resort presented evidence that the threshold for the National Weather Service to issue a "small craft advisory" in Washington is "[s]ustained winds of 21 to 33 knots [24 to 38 m.p.h.] and/or

wave heights exceeding 10 feet (or wave steepness values exceeding local thresholds)." CP at 232 (alterations in original) (footnote omitted); *see also* CP at 219. According to the National Weather Service, "Sustained Wind" is "[w]ind speed determined by averaging observed values over a two-minute period." [4] Last Resort provided evidence, based on data from the Bureau of Reclamation HydroMet weather station, located approximately .75 miles from Speelyi Beach, that plotted data points reflecting sustained wind speeds at 15-minute intervals. During the two hours from when Salgado left Speelyi Beach until he was found, the sustained winds were measured between 11.2 and 23.7 m.p.h. This does not meet the criteria for issuance of a small craft advisory in Washington.

The Estate produced evidence of wind conditions from the city of Cle Elum, situated approximately seven nautical miles from Lake Cle Elum, and not representative of wind speeds at the lake due to distance and geography, with the readings from the city of Cle Elum being measured every six hours. The Estate also relied on a report from law enforcement that noted 20 to 25 m.p.h. winds at the lake. For purposes of summary judgment, the data from the Bureau of Reclamation's HydroMet weather station is specific to the location, and is frequently measured in 15-minute intervals. Regardless,

---

[4] *Glossary: Sustained Wind*, NAT'L WEATHER SERV., https://forecast.weather.gov/glossary.php?letter=s (last visited Oct. 15, 2025); *see also* CP at 219.

the sustained wind speeds submitted by both parties do not rise to the level of a small craft advisory applicable to a Washington-specific definition.

As to wave height, Last Resort presented expert testimony, based on a review of photographs taken on the day of Salgado's death, that the waves appeared to be less than two feet high. The Estate produced evidence, based on a law enforcement officer's report, that wave heights were between three and four feet. Regardless, wave heights offered by both parties do not meet the criteria in Washington for issuance of a small craft advisory.

A trial court's grant of summary judgment may be affirmed on any theory raised by the pleadings and supported by the record. *See Bangerter v. Hat Island Cmty. Ass'n*, 199 Wn.2d 183, 188, 504 P.3d 813 (2022). The Estate did not produce evidence that a small craft advisory was justified for the conditions on Lake Cle Elum on August 27, 2022. Therefore, the trial court was correct in its determination that the Estate did not meet its burden of producing evidence that would support a genuine issue for trial.

*Proximate causation*

Here, there is no evidence beyond speculation as to how or why Salgado entered the water and drowned. Speculation is insufficient to withstand summary judgment. *See Specialty Asphalt v. Lincoln County*, 191 Wn.2d 182, 191, 421 P.3d 925 (2018).

On this record, the Estate has not carried its burden to show there is a genuine issue of material fact for trial with respect to wind being a proximate cause of Salgado

18

coming off the jet ski, entering the water, and drowning. In his deposition, Salgado's father answered, "No, I have no idea," to the question of what caused Salgado's accident. CP at 209. This testimony was in light of Salgado's father having ridden on a jet ski on the lake within the time frame during which Salgado had also ridden a jet ski on the lake. With regard to what happened to Salgado, there is only speculation. How or why Salgado entered the water and drowned is unknown. Salgado could have fallen off the jet ski or been ejected. He could have encountered debris in the water, like a floating log. He could have voluntarily elected to get off the jet ski and get into the water. Determining what prompted Salgado to come off the jet ski and enter the water is the subject of guesswork. We simply do not know what happened. This means we do not know if Salgado coming off the jet ski had anything to do, or not to do, with wind conditions on the lake.

The Estate did not present evidence that linked Salgado's death to winds that would justify a small craft advisory on August 27, 2022. The Estate was unable to present evidence that linked Salgado's death to a lack of warning by Last Resort about the wind, or the cessation of jet ski rentals by Last Resort. This means that the Estate did not make a prima facie showing of proximate causation, and the trial court properly dismissed this claim through summary judgment.

*Motion to strike declarations*

Last Resort cross appealed from the trial court's denial of its motion to strike the

declarations of Stein Gabrielsen and Lane Bowers that were submitted by the Estate in opposition to Last Resort's motion for summary judgment. Given our affirmance of the trial court's grant of summary judgment, Last Resort's cross appeal is moot as effective relief can no longer be provided. *See State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995). Review of the challenged declarations would not alter the trial court's determination that no genuine issue of material fact warranted a trial, nor do the declarations affect our affirmance of that ruling. Accordingly, we dismiss the cross appeal as moot.

## CONCLUSION

The trial court properly granted summary judgment, and we affirm the dismissal of the Estate's claims. Last Resort's cross appeal is dismissed as moot.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Murphy, J.

I CONCUR:

Lawrence-Berrey, C.J.

20

No. 40362-9-III

Fearing, J. (dissenting) — This court decides whether plaintiff Neydin Gaspar, as the personal representative of the estate of Lenin Estrada Salgado, presents sufficient facts to overcome a summary judgment dismissal of her wrongful death cause of action against The Last Resort Operations (Last Resort). Lenin Salgado drowned while operating a jet ski rented from the Last Resort. No one saw Salgado fall from the jet ski or die, but Gaspar contends the Last Resort breached a duty of care when renting the jet ski during high winds and waves. The Last Resort defends based on assumption of risk. This court must resolve whether factual questions defeat dismissal as a matter of law under the assumption of risk doctrine. This court must also resolve whether Gaspar presents facts sufficient to create a genuine issue of fact as to causation.

The majority affirm the trial court's summary judgment order favoring the Last Resort. I dissent. Based on an expert's opinion that renters of personal watercraft customarily warn customers of high winds and do not rent during hazardous conditions, I conclude a question of fact exists as to whether the doctrine of implied primary assumption of risk requires dismissal of the wrongful death action. Based on testimony that the variety of manners in which Salgado could have been jettisoned from the jet ski were rendered more hazardous by the high waves and wind, I also conclude that a question of fact exists as to whether any negligence of the Last Resort caused the death of Lenin Salgado. On the way to reaching these conclusions, I must discern the level of the waves and wind and the admissibility of expert opinions.

FACTS

I add some details missing from the majority opinion and emphasize some facts presented in that opinion. The evidence reviewed by the superior court came in part from Kittitas County Sheriff's Office Deputy Brent Severson's investigation report and weather records. The court also perused declarations of Lenin Salgado's fiancé, Ashley Nelson, his mother, Francisca Salgado, and experts Lane Bowers, Stein Erik Gabrielsen, and Patrick Hudson.

The majority opinion mentions that the Washington Parks Commission Approved Safety Checklist signed by Lenin Salgado when renting from the Last Resort warned against jumping waves. Remarkably, the Last Resort's Internet advertising, however, promised jet ski renters waves to jump. Even after Salgado's death, The Last Resort's website showed photos of men on jet skis. A caption under the photos read in part:

> With the wind on Lake Cle Elum, you are guaranteed to have some fun waves to play around with on our jet ski rentals!

Clerk's Papers (CP) at 150.

Francisca Salgado, Lenin Salgado's mother, rented the jet skis from the Last Resort. Francisca testified she would not have rented the jet skis if the Last Resort had warned the family of the weather conditions. Instead, she would have asked to reschedule or demanded a refund. She at the least would have directed her son to operate the jet ski only after the storm passed.

2

The Last Resort's employee, Kyle Groves, took Lenin Salgado, his mother, and his sister, Neydin Gaspar, to Seelyi Beach on the south side of Lake Cle Elum. Salgado had ridden a jet ski twice before. Salgado could swim, but was not a strong swimmer.

Sheriff Deputy Brent Severson's investigation report described the weather conditions at the time of the jet ski rental. The temperature lay in the 60s. The wind blew at 20-25 miles per hour (mph) with occasionally higher gusts. White cap waves reached a four-foot level. Deputy Severson did not identify his source of the weather data. The record does not disclose any expertise of Brent Severson other than his being a sheriff deputy.

Neydin Gaspar's expert, Stein Erik Gabrielsen, implanted into his declaration a screen shot entitled "Accident Details – External Conditions Weather." CP at 151. Below this screenshot, Gabrielsen embedded a "Washington Boat Accident Report," which appears intertied with the shot of the "Accident Details – External Conditions Weather." A line at the top of the screenshots reads: "cle elum [sic] windwaves.png." CP at 151. Gabrielsen's declaration referred to the screenshot or shots as the "actual weather report." CP at 151. The top screenshot reads that winds were "strong" and between 25 and 55 mph. CP at 151. The Washington Boat Accident Report listed water conditions as two-foot to six-foot waves and choppy conditions.

The Last Resort's expert, Patrick Hudson, gathered weather data from a Bureau of Reclamation HydroMet weather station .75 miles from Seelyi Beach and 1.2 miles from the location where Lenin's father, Agustin Moi Salgado, Sr., found Lenin Salgado's

perished body. Between 10 a.m. and 12 p.m., the two hours surrounding the death, winds blew from the northwest between 11.2 and 23.7 mph. A map shows the weather station further north than Seelyi Beach and not directly on the lake. Hudson calculated the peak wave height at 3.7 feet.

According to investigating officer Sheriff Deputy Brent Severson, Lenin Salgado "fell or was ejected" from the jet ski. CP at 155. No one witnessed Salgado's fall, however. An hour later, Salgado's father found Salgado face down in the water. Salgado was unresponsive. The father found the life jacket 100 feet upwind of Salgado on the beach and the jet ski downwind of Salgado on the beach. The life jacket remained buckled. According to the coroner, Salgado drowned in fresh water.

Neydin Gaspar submitted declarations from two professed experts on personal watercraft safety and jet ski rental operations: Lane Bowers and Stein Erik Gabrielsen. Bowers' credentials focus on sales and motivational speaking, not watercraft safety. He boasts of a 50,000 e-mail list of clients who trust him to help them achieve their passions and goals. His water sports expertise lies in barefoot skiing.

Lane Bowers testified to the importance of monitoring weather conditions before jet skiing. According to Bowers, one should not operate any personal watercraft during winds that rise to the level of a small craft advisory. Bowers insisted that the weather conditions on August 27, 2022, merited ceasing the use of jet skis. Bowers did not describe the nature of those weather conditions. In his succinct declaration, Bowers added:

> To the extent that a PWC [personal watercraft] (including get ski rental company) opts to provide rentals under the weather conditions at issue, it is customary within the field to, at a minimum, warn the renters of the upcoming winds and associated hazards associated with a small craft advisory level of winds. Monitoring the weather is standard practice for all marine operations to ensure the safety of the individuals involved. The obligation and practice of warning rental patrons is of heightened importance given the likelihood that any individual renting a PWC is not familiar with the weather risks.

CP at 143-44. Bowers did not testify to the issuance of a small craft wind advisory. He did not expressly declare that the weather conditions merited an advisory.

Stein Erik Gabrielsen (Erik Gabrielsen) has taught watercraft sports since 1982. His personal history includes (1) circus trapeze performances, (2) springboard diving, (3) Nordic ski jumping, (4) freestyle ski jumping, (5) lifeguarding, (6) surfing, (7) windsurfing, (8) snowboarding, and (9) skateboarding. Gabrielsen taught extreme sports in Norway, Bahamas, Virgin Islands, Dominican Republic, Martinique, Saint Lucia, Costa Rica, Mexico, Hawaii, California, Oregon, Colorado, Lake Michigan, New York, New Hampshire, Maine, North Carolina, Florida and Texas.

Erik Gabrielsen assembled facts of the jet ski rental and death from the investigative report of Kittitas County Sheriff Deputy Brent Severson. Gabrielsen testified that the investigation report informed him that Salgado possessed "very limited experience with watercraft of any form including jet skis." CP at 149.

In his declaration, Erik Gabrielsen emphasized the Last Resort's advertisement of the wind on Lake Cle Elum guaranteeing fun waves. Gabrielsen described the weather conditions at the time of the jet ski rental as listed in a police report and the Washington

5

Boat Accident Report with wind speeds at or above 25 mph and wave heights two to six feet tall. According to Gabrielsen, the inclement weather on August 27 arrived as no surprise because of similar high winds on the previous day. Gabrielsen opined that the anticipated wind speeds on August 27 justified a small craft advisory as defined by the National Weather Service. According to the Weather Service:

> A SMALL CRAFT ADVISORY MEANS THAT WIND SPEEDS OF 21 TO 33 KNOTS ARE EXPECTED TO PRODUCE HAZARDOUS WAVE CONDITIONS TO SMALL CRAFT. INEXPERIENCED MARINERS . . . ESPECIALLY THOSE OPERATING SMALLER VESSELS SHOULD AVOID NAVIGATING IN THESE CONDITIONS.

CP at 151.

In his declaration, Erik Gabrielsen, after reviewing the circumstances of the jet ski rental, insisted that Lenin Salgado suffered a preventable death. According to Gabrielsen, personal watercraft rental companies normally cease renting craft under conditions meriting a small craft warning. In the alternative, the rental company limits jet skis to a predetermined area of the water marked on a map or with buoys inside of which the renters must ride.

Erik Gabrielsen faulted Last Resort employee Kyle Grove for failing to advise Lenin Salgado and his family of imminent inclement weather conditions. More particularly, Grove never warned of wind hazards. Gabrielsen noted that the Last Resort's discovery responses admitted that the rental company informed renters of the risk of thunderstorms and lighting and recommended renters leave the lake under such conditions, but not high winds.

6

Erik Gabrielsen testified that, in his professional experience, renters of jet skis are generally unfamiliar with the differing weather advisories and that jet skiing in winds such as those blowing on August 27 should be avoided. Gabrielsen opined that the Last Resort acted grossly negligently when renting the jet skis to Lenin Salgado and his family. At the least, the Last Resort behaved grossly negligently by failing to warn Salgado of the imminent and dangerous weather conditions. A warning of such conditions is "expected as customary within the field by any watercraft expert in the process of renting jet skis or other PWC." CP at 154.

Erik Gabrielsen gave examples of his teaching kiteboarding on Lake Michigan, piloting charter boats, and lifeguarding. The prudent teacher and pilot warned a client a day before of potential hazardous weather and asked the customer whether he or she desired a refund of the payment or to reschedule the rental. The teacher, pilot, or lifeguard rendered a final decision as to whether to proceed on the morning of the event. Tours and courses were cancelled in high winds. Gabrielsen lamented the "strong incentive" to rent to customers "in questionable conditions because over the course of a year those days add up to tens of thousands of dollars in revenue."

Erik Gabrielsen further opined that the Last Resort acted grossly negligently when deciding the launch point for the jet ski. The company should have delivered the jet skis to the north end of the lake which lacked waves. Wind data showed that the winds at Lake Cle Elum blew mainly from the north, which makes jet skiing on the south end

7

riskier. Seelyi Beach, on the south end of the lake, was the most inopportune location on the lake to launch.

At the conclusion of his declaration, Erik Gabrielsen outlined the Last Resort's list of potential ways in which Lenin Salgado exited the jet ski: Salgado turned too tightly; Salgado intentionally jumped a wave; or Salgado voluntarily departed his jet ski to swim. Gabrielsen answered that a rental company should cease operations during high winds because high wind conditions increase the risks attended to all the listed possibilities. The wave intensity correlates with wind speeds and were amplified at the time of renting the jet skis to Salgado. Increased wave intensity leads to higher risks when (1) turning tightly, (2) jumping waves, or (3) swimming. The risks of swimming even for a modest swimmer escalate when using a jet ski as a launch away from shore and in high winds and waves.

Erik Gabrielsen echoed Sheriff Deputy Brent Severson's conclusion that, because of the detachment of the life jacket while still buckled, Salgado was likely unexpectedly jettisoned from the jet ski.

WIND SPEED AND WAVE HEIGHT

The parties contest the relevant wind speed and wave height on Lake Cle Elum on August 27, 2022. Before deciding whether the superior court correctly dismissed Neydin Gaspar's lawsuit on summary judgment, I, like the parties, assess the speed of the wind and the height of the waves. These measurements could impact the defense of implied primary assumption of risk and Neydin Gaspar's burden to show causation.

8

Neydin Gaspar wishes the court to consider the measurements found in Sheriff Deputy Brent Severson's investigation report. Expert Stein Erik Gabrielsen adopted these measurements for his opinions. According to the report, the wind blew at 20-25 mph with occasionally higher gusts. White cap waves reached a four-foot level.

The Last Resort employs weather data from the Bureau of Reclamation HydroMet weather station .75 miles from Seelyi Beach and 1.2 miles from the location where the father found Lenin Salgado's body. Patrick Hudson, the Last Resort's expert, adopts this data. Winds blew from the northwest between 11.2 and 23.7 mph. The peak wave height rose to 3.7 feet.

The competing measurements only provide us a range of speed and heights. No evidence establishes the precise wind speed or wave height encountered by Lenin Salgado at any particular time, let alone when Salgado left the jet ski. I view the facts and reasonable inferences in the light most favorable to the nonmoving party, Neydin Gaspar. *Watkins v. ESA Management, LLC*, 30 Wn. App. 2d 916, 923, 547 P.3d 271 (2024). Thus, I assume that, if Salgado fell from the jet ski, he did so at the top of the range of the two measurements. The Last Resort does not argue to the contrary. The Last Resort does not expressly contend that Gaspar must establish the wind velocity or wave stature at a precise time.

I question, as does the Last Resort, the validity of Deputy Brent Severson's measurements. He may have gained the data from the city of Cle Elum, many miles from Lake Cle Elum. I agree with the Last Resort that the measurements hold more accuracy

closer to the lake. But I also recognize short fallings in the HydroMet weather station recordings. Trees may have shielded the weather station and skewed its measurements. The wind generally blows stronger over water and the HydroMet station lay on land.

Neither party recognizes the possibility of higher gusts even beyond the range of wind speed given. The weather report chronicles occasional high gusts even beyond 20-25 mph winds. One higher high gust could have thrown Lenin Salgado from the jet ski. The record does not disclose the speed of the highest gust or gusts on August 27.

In the end, I need not choose which measurements to adopt for purposes of summary judgment. Even ignoring Sheriff Deputy Brent Severson's police report, Patrick Hudson's highest measurements enable Neydin Gaspar to outlast summary judgment attack. Little difference in fact lies between the measurements as stated by Severson and the measurements calculated by Hudson. Deputy Severson placed the wind speed as high as 25 mph. Patrick Hudson conceded winds blew as high as 23.7 mph, a difference of only 1.3 mph. Severson listed the wave height as high as four feet. Patrick Hudson used 3.7 feet, a disparity of only .3 feet. The Last Resort presents scant argument that these meager differences control the outcome of the suit. To the contrary, the Last Resort impliedly, if not expressly, contends it lacked a duty to warn regardless the wind strength or wave elevation.

## EXPERTS

The Last Resort assigns error to the superior court's refusal to strike the declarations of Neydin Gaspar's experts, Lane Bowers and Erik Gabrielsen. I disagree.

10

In assigning error to use of the experts' declarations, the Last Resort identifies Neydin Gaspar's principal arguments as (1) Lenin Salgado lacking a subjective understanding of the risks of jet skiing, and (2) implied primary assumption of risk does not apply because of an industry custom of providing a warning of harm under the circumstances of August 27, 2022. In turn, according to the Last Resort, Gaspar relies on expert testimony of Lane Bowers and Erik Gabrielsen for each contention. The Last Resort especially argues that the experts and Gaspar fail to support the need for a small craft advisory with evidence. Because my dissent does not rely on any lack of subjective understanding of the wind hazards, I do not address whether either expert testified to this lack of understanding or the admissibility of such testimony.

The Last Resort's assignment of error assumes that, presuming the experts opine that it needed to cease operations or give a small craft advisory, one of these actions required weather conditions to actually demand a warning. As the argument continues, weather conditions approaching, but not crossing the line demanding an advisory, did not necessitate cessation of rentals or warning to a customer. For example, assuming the government or industry standard commanded a weather advisory at 25 mph, the Last Resort did not need to take any action if the wind blew at 24.95 mph. Such an argument defies commonsense. When construing evidence in a light favorable to the Last Resort, the rental company should have taken action if the wind speed approached the minimum speed for a small craft advisory regardless if it actually surpassed the minimum speed for at least two reasons. First, the measurement of the speed could have been inaccurate.

11

Second, and more importantly, the wind speed could increase later in the day and exceed the minimum speed for an advisory. By that time, the renter could be in the middle of the lake and subject to danger.

The Last Resort characterizes Erik Gabrielsen's opinions as unreliable for several reasons. First, the Last Resort insists that Gabrielsen procured weather data from the police report. In turn, the Last Resort attacks the data as the subjective understanding of Deputy Brent Severson after the death of Lenin Salgado. No evidence, however, suggests that Brent Severson used his subjective understanding rather than objective measurements.

In his declaration, the Last Resort's expert Patrick Hudson conceded he relied on information obtained from other sources, including the HydroMet wind data for the Cle Elum dam spillway; a paper prepared by the Bureau of Reclamation; deposition testimony of Neydin Gaspar, Agustin Salgado, Jr., Agustin Salgado, Sr., and Francisca Salgado; the Kittitas County Sheriff's Office's records and photographs; and Gaspar's complaint for damages. Patrick Hudson went further and stated that he relied on all of these documents when forming his opinions. Thus, the Last Resort's expert relied on the same sheriff deputy report on which it claims Erik Gabrielsen cannot rely. Judicial estoppel precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position. *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007). For this reason alone, I reject the Last Resort's attack on Erik Gabrielsen's reliance on Deputy Brent Severson's police report.

12

The Last Resort further challenges the opinions of Erik Gabrielsen because Gabrielsen did not declare that experts in his field reasonably rely on a police report's weather data. ER 703 only permits experts to base an opinion on those facts or data, otherwise inadmissible in evidence, if experts in the field reasonably rely on the facts or data for forming opinions. Erik Gabrielsen did not declare that personal watercraft safety experts extract weather data from police reports when drawing opinions. Nevertheless, this challenge suffers from the defect previously identified. The Last Resort's expert Patrick Hudson also relied on the police report in forming opinions without any testimony that experts in his field reasonably rely on such information. To repeat, a party cannot assert one position in a court proceeding and later seek an advantage by taking an inconsistent position. *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538 (2007).

The Last Resort criticizes the wave heights used by Erik Gabrielsen as conflicting with photographs taken. In doing so, the Last Resort asks this court to weigh the evidence in favor of the moving party during the summary judgment procedure. In ruling on summary judgment, we do not weigh evidence or assess witness credibility. *Sluman v. State*, 3 Wn. App. 2d 656, 699-700, 418 P.3d 125 (2018). Disputes about the validity of the facts underlying an expert's opinion go to weight, rather than admissibility. *Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016); *Asphy v. State*, 31 Wn. App. 2d 605, 623, 552 P.3d 325, *review denied,* 3 Wn.3d 1033, 559 P.3d 1023 (2024). A borderline case should be decided in favor of admissibility, allowing the jury to decide

for itself whether the opinion is reliable. *Volk v. DeMeerleer*, 187 Wn.2d 241, 277

(2016); 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE

§ 702.27, at 117 (6th ed. 2016).

The Last Resort complains that Erik Gabrielsen opines that the rental company

was "grossly negligent." It cites ER 704 for the proposition that an expert may not render

legal conclusions such that Gabrielsen's use of the term "gross negligence" should be

stricken. ER 704 says something else. The rule reads:

> Testimony in the form of an opinion or inferences otherwise
> admissible is not objectionable because it embraces an ultimate issue to be
> decided by the trier of fact.

Thus, the rule authorizes, not precludes, testimony. An expert witness may employ the

word "negligence" when testifying as long as the witness employs a correct definition of

the word. *Lee v. Hartwig*, 848 S.W.2d 496, 498 (Mo. Ct. App. 1992). The Last Resort

does not complain that Erik Gabrielsen misunderstood the concept of negligence or gross

negligence when he opined that the rental company acted with gross negligence.

Patrick Hudson testified that Washington issues small craft advisory during

sustained winds of 24 to 38 mph. At the same time, he testified that wind speeds

measured up to 23.7 mph. The Last Resort picks at nits when asserting that the wind did

not justify a small craft advisory when the speed was .3 mph below the minimum speed

velocity.

Finally, the Last Resort next contends that police reports are hearsay and may not

be considered on summary judgment such that the court should not consider Erik

Gabrielsen's declaration. It cites *State v. Hines*, 87 Wn. App. 98, 102, 941 P.2d 9 (1997) for this proposition. As its title suggests, *State v. Hines* was a criminal prosecution, not a summary judgment proceeding. In *State v. Hines*, neither party sought to introduce the report through the testimony of an expert, who relied on the report. Remember again that the Last Resort's expert witness relied on Deputy Brent Severson's report.

ASSUMPTION OF RISK

This court must decide whether Neydin Gaspar presents evidence sufficient to raise a genuine issue of fact as to whether implied primary assumption of risk bars her cause of action. This question entails more of a discussion of the law than an analysis of the facts.

Neydin Gaspar forwards two theories of liability. First, the Last Resort should have ceased operations on August 27, 2022, because of high winds. Second, at the least, the Last Resort should have warned Lenin Salgado and his family of the danger of high winds so that the family could have exercised a knowledgeable decision as to whether to jet ski that day. Francisca Salgado testified that, if given a warning, she would have cancelled the rental and asked for a refund or rescheduled the rental. In response, the Last Resort maintains that, regardless of the theory of responsibility, implied primary assumption of risk applies because jet skiing entails a known, inherent, open, and obvious risk of the danger of wind and waves.

Both Lane Bowers and Erik Gabrielsen testify to an industry custom or standard, under which companies renting personal watercraft warn customers of potential high

wind conditions and give customers an option to cancel the rental. Both experts opine that such warning should have been given to the Salgado family. A jury could even draw inferences from the testimony of the Last Resort's expert, Patrick Hudson, to conclude such a warning should have been given. Many legal principles attended to the doctrine of assumption of risk imperil the success of Neydin Gaspar's suit. Nevertheless, because of the testimony of the industry custom and an exception to implied primary assumption of risk stemming from such a custom, I conclude the trial court erred when granting summary judgment.

A negligence claim requires the plaintiff to establish (1) the existence of a duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury. *Tincani v. Inland Empire Zoological Society*, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994). Thus, to prevail on her negligence claim, Neydin Gaspar must establish that the Last Resort owed her a duty of care. *Folsom v. Burger King*, 135 Wn.2d 658, 671, 958 P.2d 301 (1998). The tort concept of duty overlaps with the contract and tort principles of assumption of risk. Often assumption of risk relieves the defendant of a duty. *Brown v. Stevens Pass, Inc.*, 97 Wn. App. 519, 523, 984 P.2d 448 (1999); *Codd v. Stevens Pass, Inc.*, 45 Wn. App. 393, 402, 725 P.2d 1008 (1986).

I briefly explore the variegated versions of assumption of risk. The term "assumption of the risk" expresses several distinct common law theories, derived from different sources, which apply when a plaintiff knowingly exposes himself to particular risks. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 409, 398 P.3d 1205 (2017)

16

(citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 68 (5th ed. 1984)). Stated differently, the general rubric of assumption of risk does not signify a singular doctrine but rather encompasses a cluster of discrete concepts. *Kirk v. Washington State University*, 109 Wn.2d 448, 453, 746 P.2d 285 (1987). Washington law and most other states' jurisprudence recognize four taxonomies of the assumption of risk doctrine: (1) express, (2) implied primary, (3) implied unreasonable, and (4) implied reasonable. *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 636, 244 P.3d 924 (2010); *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 409 (2017); 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 9:11, at 398-99 (4th ed. 2013).

Before the enactment of comparative negligence and comparative fault statutes, practitioners and courts encountered little reason to distinguish the four versions of assumption of risk, because at common law all assumption of the risk completely barred recovery. *Scott v. Pacific West Mountain Resort*, 119 Wn.2d 484, 496, 834 P.2d 6 (1992). Today, the first two categories of assumption of risk, express assumption and implied primary assumption continue to operate as a complete bar to a plaintiff's recovery. *Kirk v. Washington State University*, 109 Wn.2d 448, 453-54 (1987); *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 410 (2017). Implied unreasonable and implied reasonable assumption, however, meld into contributory negligence and merely reduce the plaintiff's recoverable damages based on comparative fault pursuant to RCW 4.22.005 and .015. *Scott v. Pacific West Mountain Resort*, 119 Wn.2d 484, 497

(1992). The gist of implied reasonable and implied unreasonable assumption of risk is that the defendant performed conduct that increased the risk of an activity or situation beyond the risks inherent in the activity or situation and the plaintiff reasonably or unreasonably encountered this increased risk. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 411 (2017).

The Last Resort relies solely on implied primary assumption of risk. A Court of Appeals decision suggested renaming implied primary assumption of risk to inherent peril assumption of risk because of the confusing and homophonic terminology of the four taxonomies of assumption of risk. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 410 (2017). I will alternatively refer to implied primary assumption of risk and inherent peril assumption of risk.

Implied primary assumption of risk follows from the plaintiff engaging in risky conduct, from which the law implies consent. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 410 (2017). This form of assumption of risk bars a claim resulting from specific known and appreciated risks impliedly assumed often in advance of any negligence of the defendant. *Scott v. Pacific West Mountain Resort*, 119 Wn.2d 484, 497 (1992). Plaintiff's consent to relieve the defendant of any duty is implied based on the plaintiff's decision to engage in an activity that involves those known risks. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 411 (2017). Whether inherent peril assumption of risk applies depends on whether an inherent risk of the activity harmed the plaintiff. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 411 (2017). The plaintiff

assumes the dangers that are inherent in and necessary to a particular activity. *Tincani v. Inland Empire Zoological Society*, 124 Wn.2d 121, 144 (1994).

The classic example of inherent peril assumption involves participation in sports when a participant knows that the risk of injury is a natural part of such participation. *Gleason v. Cohen*, 192 Wn. App. 788, 798, 368 P.3d 531 (2016). One who participates in sports impliedly assumes the risks inherent in the sport. *Scott v. Pacific West Mountain Resort*, 119 Wn.2d 484, 498 (2012). To the extent a risk inherent in the sport injures a plaintiff, the defendant has no duty and there is no negligence. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 412 (2017).

Inherent peril assumption extends to water sports. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 412 (2017). One who engages in water sports assumes the reasonably foreseeable risks inherent in the activity. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 412 (2017). The Last Resort emphasizes that bodies of water often undergo change, and changing conditions in the water do not alter the assumption of risk. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 412 (2017). A defendant owes no duty to warn of the presence of natural transitory conditions. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 412 (2017).

Inherent peril assumption, as does express assumption of risk, demands the presence of three elements. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 413 (2017). The evidence must show (1) the plaintiff possessed full subjective understanding, (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter

19

the risk. *Kirk v. Washington State University*, 109 Wn.2d 448, 453 (1987). The participant must know that the risk is present, and he or she must further understand its nature; his or her choice to incur it must be free and voluntary. *Brown v. Stevens Pass, Inc.*, 97 Wn. App. 519, 523 (1999).

Neydin Gaspar mentions that the court does not, and a jury will not, know whether Lenin Salgado gained full subjective understanding of the presence and nature of the specific risk of wind. Gaspar impliedly seeks reversal of the summary judgment dismissal because the Last Resort cannot satisfy the burden to show Salgado's subjective understanding of the risk. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 414 (2017) questioned whether the doctrine of inherent peril assumption of risk could apply in wrongful death cases. Because I would reverse on other grounds, I do not respond to this contention.

Neydin Gaspar primarily bases her defense to the Last Resort's affirmative defense on an industry custom to warn customers of impending weather hazards such as the windstorm that purportedly caused Lenin Salgado's death. This rule arises from dicta in *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 417 (2017). The Court of Appeals in *Pellham* quoted a New Hampshire decision that promoted the principle that a defendant may be held liable when a reasonable person would customarily instruct a plaintiff in respect to the dangers inherent in an activity and the manner in which such risks could be minimized and their failure to do so caused the plaintiff's injuries. *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 417 (2017) (quoting *Allen v. Dover*

20

*Co-Recreational Softball League*, 148 N.H. 407, 422, 807 A.2d 1274 (2002)).  The court,

in *Allen*, however, did not apply this principle because the injured party did not forward

such an argument.

On the New Hampshire Supreme Court, in *Allen v. Dover Co-Recreational Softball

League*, cited its earlier decision, *Evans v. Foster*, 95 N.H. 194, 60 A.2d 130 (1948), for

the proposition that an industry wide standard to instruct on inherent dangers may lead to

liability.  Hugh Evans worked at a sawmill for Irvin Foster.  While marking lumber with

an edger, Evans suffered injuries that necessitated an amputation of the right arm.  Foster

appealed a verdict favoring Evans.  The Supreme Court affirmed the verdict on the basis

that Foster knew better than his employee of the risks of operating the edger.

Assumption of risk was not an issue.

On the one hand, the *Pellham* dicta comes from a New Hampshire Supreme

Court's misreading of one of its earlier decisions.  No American decision specifically

adopts the principle embedded in the dicta.  The dicta conflicts with the broader rule that

a defendant avoids liability when a sport participant suffers injury from an inherent risk

of the injury.  On the other hand, the Last Resort does not directly criticize the dicta, but

instead focuses its attack on the facts not falling within the purview of the rule announced

in the dicta.  No Washington or foreign decision expressly disagrees with the dicta.

Exceptions apply to most broad rules such that exceptions may apply to the principle that

a participant in a sport assumes risks inherent in the sport.  Most importantly, the law of

negligence often holds a business owner liable for violations of an industry standard or

practice that cause injury to other parties. *Haysom v. Coleman Lantern Co., Inc.*, 89

Wn.2d 474, 487, 573 P.2d 785 (1978); *Meyers v. Meyers*, 81 Wn.2d 533, 537, 503 P.2d

59 (1972); *Swartley v. Seattle School District No. 1*, 70 Wn.2d 17, 21, 421 P.2d 1009

(1966).

A series of California decisions apply implied primary assumption of risk to jet

skiing. The Last Resort and this court rely on one of the decisions, *Truong v. Nguyen*,

156 Cal. App. 4th 865, 67 Cal. Rptr. 3d 675 (2007). Under California law, jet skiing is

an active sport involving physical skill and challenges that pose a significant risk of

injury to participants in the sport. *Whelihan v. Espinoza*, 110 Cal. App. 4th 1566, 2 Cal.

Rptr. 3d 883, 885 (2003). The absence of the common law doctrine of primary

assumption of risk would chill vigorous participation in jet skiing, thereby having a

"deleterious effect" on the nature of the sport as a whole. *Peart v. Ferro*, 119 Cal. App.

4th 60, 72, 13 Cal. Rptr. 3d 885, 894 (2004); *Whelihan v. Espinoza*, 110 Cal. App. 4th

1566, 2 Cal. Rptr. 3d 883, 885 (2003). Jet skiing is a recreational water activity with

well-recognized inherent risks, including drowning, collisions with water, and hazards

from natural conditions such as wind, waves, and currents. *Truong v. Nguyen*, 156 Cal.

App. 4th 865 (2007).

The California decisions of course harms Neydin Gaspar. Although in the extract,

the principles pulled from *Truong v. Nguyen* help the Last Resort, the decision entails a

suit by a passenger who died as a result of a collision between the personal water craft, in

which she rode, with another water craft owned and operated by the defendant.

*Truong* followed *Whelihan v. Espinoza*, 110 Cal. App. 4th 1566, 2 Cal. Rptr. 3d 883 (2003) which entailed a suit between the driver of one jet ski against another driver of a jet ski after the two jet skis collided on the water. No commercial transaction occurred. No money exchanged between one who should have superior knowledge of jet skiing. The suit lay between two participants in the sport.

*Peart v. Ferro*, 119 Cal. App. 4th 60, 72 (2004) also involved a collision between two jet skis and a suit between a teenage driver of one jet ski against the adult supervising him on board. The court emphasized that both the plaintiff and defendant engaged in recreational activity. The Last Resort did not engage in the same recreational activity as Neydin Gaspar, but instead participated in a commercial transaction for profit.

Neydin Gaspar's appeal also differs from the facts in *Pellham v. Let's Go Tubing, Inc.*, 199 Wn. App. 399, 409 (2017). Brian Pellham sustained injury when floating in an inner tube on the Yakima River. A log extended into the water struck him. Pellham did not argue that logs are uncommon in rivers when rafting. He did not argue against a common person knowing of logs in the river. Neydin Gaspar's experts testified that the common person does not understand the risks involved in high winds and waves when operating a jet ski. The Last Resort advertised the enjoyment of waves while jet skiing.

## CAUSATION

The Last Resort forwards a second independent reason to affirm the trial court's summary judgment dismissal of Neydin Gaspar's suit. The Last Resort argues that Gaspar's evidence fails to present a genuine issue of material fact that any breach of duty

by the company caused Lenin Salgado's death. The Last Resort emphasizes that no one saw Salgado fall from the jet ski. Thus, any jury would need to speculate in order to find that any negligent act of the rental company caused the drowning of Salgado. According to the Last Resort, Lenin Salgado could have experienced a cardiac arrest unrelated to weather conditions on Lake Cle Elum. Salgado could have been riding the jet ski recklessly and been ejected from the jet ski no matter the wind speed or wave height. According to the Last Resort, Neydin Gaspar does not explain how the alleged risks would be minimized by a specific warning or what warning should be given. As the argument proceeds, no lack of evidence establishes the point of impact and no evidence shows the conduct of Salgado when he purportedly was jettisoned. His father navigated the lake for an hour thereafter without any problem.

Neydin Gaspar maintains that a jury could reasonably conclude that Lenin Salgado died from being tossed from the jet ski by high wind or wave. Gaspar suggests no other reasonable explanation explains the death. Salgado's life jacket remained buckled and lay a hundred feet away from him as his body reposed on the beach. Salgado would not have removed the life jacket and then rebuckled it without wearing it. Deputy Brent Severson concluded a weather-related accident caused the death. He further concluded, as did Erik Gabrielsen, that being jettisoned from the jet ski contributed to the death. Weather conditions could have decreased as the father drove around the lake. Regardless of whether weather conditions merited a small craft warning, the wind was in that range, and, according to the experts, a warning should have been given.

Neydin Gaspar emphasizes her expert testimony that the Last Resort should have ceased rentals on August 27, 2022, or at least given Gaspar the option of a refund or to reschedule because of potential weather conditions. Gaspar, in turn, highlights that her mother, Francisca Salgado, would not have rented the jet skis with such warnings. Of course, Lenin Salgado would not have operated the personal watercraft had his mother not rented the jet skis.

A negligence claim requires the plaintiff to establish (1) the existence of a duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury. *Tincani v. Inland Empire Zoological Society*, 124 Wn.2d 121, 127-28 (1994). Proximate cause consists of two elements: cause in fact and legal causation. *Albertson v. State*, 191 Wn. App. 284, 296, 361 P.3d 808 (2015). The Last Resort relies on cause in fact, not proximate cause. Even if the complainant establishes negligence, the defendant may not be held liable unless its negligence caused the accident. *Marshall v. Bally's Pacwest, Inc.*, 94 Wn. App. 372, 378, 972 P.2d 475 (1999).

Cause in fact, or "but for" causation, refers to the physical connection between an act and an injury. *Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985). The plaintiff must establish that the harm suffered would not have occurred but for an act or omission of the defendant. *Joyce v. Department of Corrections*, 155 Wn.2d 306, 322, 119 P.3d 825 (2005).

A ubiquitous term found in the case law of causation is the word "speculation." Many decisions rest on this word. The Last Resort argues that Neydin Gaspar speculates when contending that the windy weather caused Lenin Salgado's death.

Evidence establishing proximate cause must rise above "speculation, conjecture, or mere possibility." *Reese v. Stroh*, 128 Wn.2d 300, 309, 907 P.2d 282 (1995). "Speculation" and "conjecture," in this context, mean the same thing. *Frescoln v. Puget Sound Traction, Light & Power Company*, 90 Wash. 59, 63, 155 P. 395 (1916). The plaintiff cannot rest a claim for liability on a "speculative theory." *Marshall v. Bally's Pacwest, Inc.*, 94 Wn. App. 372, 381 (1999). The plaintiff must supply proof for a reasonable person to, "without speculation," infer that the act of the other party more probably than not caused the injury. *Little v. Countrywood Homes, Inc.*, 132 Wn. App. 777, 781, 133 P.3d 944 (2006). Cause in fact does not exist if the connection between the act and the later injury is "indirect and speculative." *Estate of Bordon v. Department of Corrections*, 122 Wn. App. 227, 240, 95 P.3d 764 (2004).

Labeling causation as speculative plays a unique role in summary judgment jurisprudence. If one takes many statements of the law literally, a court must withdraw consideration of a tort suit from a jury and grant summary judgment or a directed verdict to the defendant, if the plaintiff bases her assertion of causation on speculation, or at least if the facts present at least two speculative causes. Under these statements of the law, identifying speculation becomes the prerogative of the judge, not the jury.

Washington courts often declare that when "two or more conjectural theories" exist, "under one or more of which a defendant would be liable and under one or more of which a plaintiff would not be entitled to recover, a jury will not be permitted to conjecture how the accident occurred." *Gardner v. Seymour*, 27 Wn.2d 802, 809, 180 P.2d 564 (1947). Courts often quote and apply this stated rule. *Schmidt v. Pioneer United Dairies*, 60 Wn.2d 271, 276, 373 P.2d 764 (1962); *Marshall v. Bally's Pacwest, Inc.*, 94 Wn. App. 372, 379 (1999); *Schneider v. Rowell's, Inc.*, 5 Wn. App. 165, 168, 487 P.2d 253 (1971). The Last Resort relies on this rule when arguing the possibility of other causes of Lenin Salgado tumbling from the jet ski or causes of his death. I refer to the rule as the stated rule.

I criticize the stated rule. The rule applies only if at least two speculative causes subsist, suggesting that, if only one conjectural theory exists, the jury can decide causation. The rule begs the question of what action the trial court takes if the plaintiff's identified cause is speculative, but neither the defendant nor the court can conjure any other potential cause of the injuries.

The stated rule may assume that two causes of an event are just as likely to be the true cause. I question whether causes of human events can be precisely weighed such that one possible cause is just as likely to be the cause of a plaintiff's injuries as another possible cause.

The stated rule suffers from a more fundamental flaw. The rule assigns to the trial court and eventually an appeals court the task of discerning whether a plaintiff's offered

27

cause depends on speculation. But I question whether the trial court or an appellate court always sits in a better position than twelve representatives of the community when surmising if an alleged cause suffers from speculation. Judges receive no special training and have no peculiar insight into cause and effect in the physical world. We specialize in wordsmithing and sophistry, not applied physics and applied psychology. Or in this instance meteorology and the operation of a jet ski.

If the trial court applies the stated rule and a plaintiff survives a summary judgment or directed verdict motion, the court must have determined that the plaintiff's proffered cause does not rely on speculation. Nevertheless, even if a plaintiff defeats a summary judgment motion by presenting a factual question on causation, the defense still argues to the jury that the plaintiff bases his or her claim on speculation. Based on the stated rule, defense counsel should be precluded from telling the jury that plaintiff's claim relies on speculation if the case proceeds beyond the summary judgment stage.

Other rules of causation affirm and expand the stated rule probably even to cases when the defense does not identify other possible causes. The claimant cannot show that an accident happened in a certain way by simply showing that it might have happened in that way and without further showing that it could not reasonably have happened in any other way. *Gardner v. Seymour*, 27 Wn.2d 802, 810 (1947); *Whitehouse v. Bryant Lumber & Shingle Co.*, 50 Wash. 563, 565-66, 97 P. 751 (1908). When more than one possible cause of an injury exists, plaintiff's evidence, whether direct or circumstantial, must reasonably exclude every hypothesis other than plaintiff's offered cause.

*O'Donoghue v. Riggs*, 73 Wn.2d 814, 824, 440 P.2d 823 (1968). The facts relied on to establish a theory by circumstantial evidence must be of such a nature and so related to each other that it is the only conclusion that fairly or reasonably can be drawn from them. *Schmidt v. Pioneer United Dairies*, 60 Wn.2d 271, 276 (1962). In the context of a summary judgment motion or a motion for directed verdict, the trial court must view conflicting evidence in the light most favorable to the nonmovant party and determine "whether the proffered result is the only reasonable conclusion." *Estate of Bordon v. Department of Corrections*, 122 Wn. App. 227, 240 (2004).

I also question these additional rules. The jury usually determines what conclusions are reasonable. The better rule would be that the reviewing court determines if plaintiff's proffered cause is a reasonable conclusion rather than the only reasonable conclusion or the most reasonable conclusion.

Speculation is a specious word. One person's proof may be another person's speculation. What constitutes speculation may enter a shadow zone where some triers of fact may determine plaintiff's tendered cause to be speculative, while other reasonable people would determine causation to be proved. Whereas, the trial court should not allow a jury to decide a negligence claim if the jury must undoubtedly speculate as to whether any breach of duty caused the plaintiff's injuries, reasonable persons may disagree as to whether causation is speculative in discrete circumstances. Thus, when addressing purported "speculative" claims, the trial court should give the benefit of the doubt as to

causation to the plaintiff and dismiss a claim only to the extent the court can decide that all reasonable people would conclude causation to be speculative.

In *Conrad v. Alderwood Manor*, 119 Wn. App. 275, 78 P.3d 177 (2003), family members of Enid Conrad, age 91, sued her nursing care facility as a result of a broken femur. Because of an earlier debilitating stroke, Conrad could not explain how she broke her femur. The family claimed moving of Conrad by facility staff caused the bone break. In response, the care facility postulated numerous potential causes, including her osteoporosis and Conrad's husband moving her. The care facility then relied on the stated rule that, if more than one event could have caused the injury and each event is as plausible as the other events, the jury must impermissibly rely on speculation such that the defendant is entitled to a directed verdict. This court affirmed a verdict in favor of the Conrad family on appeal because the family presented believable evidence to refute each of the care facility's proffered causes.

In *Esparza v. Skyreach Equipment, Inc.*, 103 Wn. App. 916 (2000), Matt Esparza suffered severe injuries when he stood on a manlift and the manlift tipped. Esparza argued that the malfunctioning of circuit cards caused the tipping and that, had Skyreach Equipment, the company that rented the lift to his employer, timely and reasonably inspected the mechanism, the company could have prevented the malfunction. Skyreach Equipment claimed the existence of other possible causes. This court affirmed a verdict in favor of Esparza. This court reviewed expert testimony and concluded that a rational

juror "could have" concluded that the failure to inspect was the "likely" cause of the tipping. 103 Wn. App. at 928 (2000).

I note that the court, in *Esparza v. Skyreach Equipment, Inc.*, employed the phrase "could have" and the word "likely" in the same sentence. The terms diverge since "could have" means possibly and "likely" means "probably." Nevertheless, I extract from the sentence the notion that, assuming there is more than one possible cause of plaintiff's injury, the jury should determine what cause probably caused the injury and whether other causes are speculative. If the court concludes that plaintiff's proffered cause "could have" been the likely cause, the court should allow the jury to decide the likely cause.

Some rules of causation benefit Neydin Gaspar. Precise knowledge of how an accident occurred is not required to prove cause in fact. *Mehlert v. Baseball of Seattle, Inc.*, 1 Wn. App. 2d 115, 118, 404 P.3d 97 (2017); *Klossner v. San Juan County*, 21 Wn. App. 689, 692, 586 P.2d 899 (1978). The plaintiff need not establish causation by direct and positive evidence. *Attwood v. Albertson's Food Centers, Inc.*, 92 Wn. App. 326, 331, 966 P.2d 351 (1998). The claimant can establish causation by inferences arising from circumstantial evidence. *Klossner v. San Juan County*, 21 Wn. App. 689 (1978); *Raybell v. State*, 6 Wn. App. 795, 801, 496 P.2d 559 (1972). He or she need only show by a chain of circumstances from which the ultimate fact required is reasonably and naturally inferable. *Conrad v. Alderwood Manor*, 119 Wn. App. 275, 281, 78 P.3d 177 (2003). Plaintiff need not negate every possible cause. *Frescoln v. Puget Sound Traction, Light & Power Company*, 90 Wash. 59, 65, 155 Pac. 395 (1916).

The Last Resort argues that Neydin Gaspar relies only on speculation because she lacks any direct knowledge that Lenin Salgado was ejected from the jet ski because of wind and wave. According to the Last Resort, Gaspar presents insufficient evidence of cause in fact since no one saw Lenin Salgado fall from the jet ski. The Last Resort then advances other possible causes of Salgado's tumble: Salgado turned too tightly; Salgado intentionally jumped a wave; or Salgado voluntarily departed his jet ski to swim. According to the Last Resort, the stated rule requires summary judgment in its favor because the other possible causes are as likely to be the true cause of either Salgado's fall or death.

Neydin Gaspar emphasizes many facts in her effort to defeat summary judgment. The weather records showed winds of 23.7 mph, if not more, with occasional gusts. The records showed waves as high as 3.7 feet. Gaspar's experts consider such conditions hazardous. Lenin Salgado's father found Salgado's buckled life jacket yards from the limp body of Salgado. Salgado was young and in good health.

I reject application of stated rule under the circumstances of Lenin Salgado's death by drowning. First, if the plaintiff can show that her offered cause could have caused his injury, the jury should decide whether the plaintiff's proffered cause is based on speculation or if defendant's list of possible causes relies on speculation. Second, and more importantly, the Last Resort's catalog of possible causes of the death are reasons why the company should have ceased renting on August 27, 2022. The high wind and

waves rendered those events more likely to happen and more likely to kill or injure Lenin Salgado.

I have reserved for the end the obligatory summary judgment principles. Summary judgment is proper if the records on file with the trial court show no genuine issue as to any material fact. CR 56(c). The appeals court, like the trial court, construes all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Barber v. Bankers Life & Casualty Company*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972). If any genuine issue of material fact exists, the court must order a trial. *LaPlante v. State*, 85 Wn.2d 154, 158, 531 P.2d 299 (1975).

Cause in fact usually presents a question for the trier of fact and is generally not susceptible to summary judgment. *Martini v. Post*, 178 Wn. App. 153, 164, 313 P.3d 473 (2013). In most instances, the question of cause in fact is for the jury. *Daugert v. Pappas*, 104 Wn.2d 254, 257(1985). The plaintiff can survive a motion to dismiss if he presents "some competent evidence of factual causation" that precludes jury speculation. *Estate of Bordon v. Department of Corrections*, 122 Wn. App. 227, 242 (2004). The court may decide cause in fact as a matter of law, however, if the facts and inferences from them are plain and not subject to reasonable doubt or difference of opinion. *Daugert v. Pappas*, 104 Wn.2d 254, 257, 704 P.2d 600 (1985). Stated another way, causation becomes a question of law for the court only when the causal connection is "so speculative and indirect" that reasonable minds could not differ. *Mehlert v. Baseball of Seattle, Inc.*, 1 Wn. App. 2d 115, 119 (2017); *Doherty v. Municipality of*

*Metropolitan Seattle*, 83 Wn. App. 464, 469, 921 P.2d 1098 (1996). Use of the phrase "so speculative" suggests degrees of speculation such that the jury should often be the decider of speculation.

Summary judgment procedure aims to avoid a useless trial. *Preston v. Duncan*, 55 Wn.2d 678, 681, 349 P.2d 605 (1960). Trial is not useless but absolutely necessary when issues of fact could lead to liability against the defense. *Preston v. Duncan*, 55 Wn.2d at 678, 681 (1960)

## CONCLUSION

I dissent from the majority. I would reverse the summary judgment dismissal of Neydin Gaspar's cause of action and remand to the superior court for further proceedings.

_____
Fearing, J.